MICHAEL GILBERT AND SANDRA GILBERT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gilbert v. Commissioner
Docket No. 9528-82.
United States Tax Court
T.C. Memo 1987-165; 1987 Tax Ct. Memo LEXIS 161; 53 T.C.M. (CCH) 461; T.C.M. (RIA) 87165; March 26, 1987. *161 Petitioner-husband was the sole limited partner of a limited partnership formed to purchase and exploit a made-for-television movie musical entitled "It's A Bird, It's A Plane . . . It's Superman." The parties executed timely Consents and Special Consents to Extend the Time to Assess Tax, Forms 872 and 872-A, for petitioners' Federal income tax for each year in issue. Held, the statute of limitations does not bar the assessment or collection of any deficiency determined, based upon agreements to extend the time for assessment. Sec. 6501(c)(4), I.R.C. 1954. Held further, the activities of the Partnership lack economic substance, and respondent has disallowed properly the deduction of petitioner-husband's distributive shares of partnership losses, deductions and investment credit. Rose v. Commissioner, 88 T.C.     (Feb. 5, 1987). Richard B. Wallace,William H. Karo, and Theodore Brill, for the petitioners. James W. Clark, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Chief Judge: Respondent determined, by notice of deficiency dated March 24, 1982, deficiencies in the Federal income taxes of petitioners Michael Gilbert and Sandra Gilbert for the taxable *162 years ended December 31, 1975 through December 31, 1977, as follows: Taxable Year
Deficiency
1975
$72,724
1976
56,824
1977
60,837
Neither party has made any concessions in this case. The issues for decision are (1) whether the statute of limitations bars the assessment and collection of any of the determined deficiencies and (2) whether petitioners are entitled to deduct petitioner Michael Gilbert's distributive shares of partnership losses, depreciation deductions and investment credit arising from his involvement as a limited partner in a limited partnership. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulated facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Michael Gilbert and Sandra Gilbert, husband and wife, resided in Miami Beach, Florida at the time they filed their petition in this case. Petitioners filed joint Federal income tax returns for each of the taxable years in issue, using the cash basis method of accounting, with the Internal Revenue Service Center in Chamblee, Georgia. At all relevant times, petitioner Michael Gilbert was a practicing psychiatrist and petitioner Sandra Gilbert was a housewife. *163 Petitioners timely filed their 1975 Federal income tax return on October 15, 1976, pursuant to an extension of time to file such return. Petitioners, on August 31, 1979, and respondent, on September 17, 1979, executed a written agreement entitled Consent to Extend the Time to Assess Tax (Form 872), which extended the time to assess a deficiency in petitioners' 1975 Federal income tax until December 31, 1980. Petitioners, on June 23, 1980, and respondent, on July 16, 1980, executed a second written agreement entitled Special Consent to Extend the Time to Assess Tax (Form 872-A), which extended indefinitely the period of assessment with respect to petitioners' 1975 taxable year. Petitioners filed their 1976 Federal income tax return on November 14, 1977. Petitioners, on August 20, 1980, and respondent, on September 10, 1980, executed a Form 872-A, which extended indefinitely the period of assessment with respect to petitioners' 1976 taxable year. Petitioners timely filed their 1977 Federal income tax return on October 15, 1978, pursuant to an extension of time to file such return. Petitioners, on February 18, 1981, and respondent, on February 21, 1981, executed a Form 872-A, which *164 extended indefinitely the period of assessment with respect to petitioners' 1977 taxable year. On several occasions, petitioner Michael Gilbert (hereinafter petitioner) was presented with investment propositions, including the movie purchase here, by Lawrence C. Porter (Porter), petitioner's attorney and close friend. Prior to the years in issue, petitioner's investment ventures included interests in an apartment building, an orange grove, a cattle breeding farm and a mobile home park. Prior to February 1975, petitioner had no experience or training in television program distribution and Porter had no such formal training. On or about February 17, 1975, Porter and producer Norman Twain (the Seller), owner of Norman Twain Productions, discussed the proposed sale of the Seller's rights to a made-for-television movie entitled "It's A Bird, It's A Plane . . . It's Superman" (the Movie). The Movie was adapted from the Broadway stage musical "Superman" by Charles Strouse and Lee Adams based upon the comic strip character. Its cast included David Wilson as Superman, Loretta Swit, Leslie Warren, David Wayne and Allen Ludden. The sale of the Seller's rights to the Movie would be made expressly *165 subject to an agreement (the license agreement) executed in 1974 between the Seller and the American Broadcasting Company television network (ABC). The license agreement granted to ABC the exclusive right to air two non-prime time network broadcasts of the Movie in the United States during the 18-month period from approximately January 14, 1975, that is, the date that the Seller had delivered the Movie to ABC, until July 15, 1976, for which ABC paid a license fee in the amount of $170,000. ABC also obtained the exclusive option to air one prime time broadcast of the Movie, which if exercised, for an additional license fee in the amount of $140,000, would extend the license agreement's term for an additional 6 months, until January 15, 1977. Porter received a personal and confidential memorandum (the memorandum), dated February 19, 1975, with respect to the Seller's proposed sale of the Movie. [1] The memorandum stated the Movie's purchase price as $500,000, payable $100,000, or 20 percent, upon closing, with the $400,000 balance, or 80 percent, to be evidenced by a 10-year nonrecourse promissory note. It also stated that the Seller had represented the Movie's fair market value to be *166 approximately $500,000. The memorandum described the terms of the Seller's license agreement with ABC. It stated that ABC had paid $170,000 to the Seller for the exclusive right to air the Movie twice during non-prime time and that the first of such broadcasts had been scheduled for February 21, 1975. The memorandum also stated that ABC had the option to broadcast the Movie once during prime time upon its payment of an additional license fee in the amount of $140,000. The memorandum projected total income in the amount of $220,000 to be derived from the Movie as follows: 1. ABC option
$140,000
2. Rights in Australia
10,000
3. TV rights in the rest
of the world --
(a) For the first year
35,000
(b) For the next 4 years
35,000
Total
$210,000
[sic]
During his discussions with the Seller, Porter was advised that if ABC were to exercise its option, $103,000 of the $140,000 option price would be paid to the Movie's authors, musicians, cast director and producer, and this fact also was stated in the memorandum. The memorandum also provided that *167 the promissory note would be payable only out of the Movie's net tape proceeds, although its $400,000 principal amount would be reduced first by ABC's $170,000 license fee to the Seller. The note would be paid in accordance with the following percentages of net proceeds: (1) 50 percent of the first $50,000, (2) 20 percent of the next $100,000 and (3) 50 percent of additional net proceeds until the note is fully paid; the balance of the net proceeds would be retained by Superman Enterprises, Ltd., petitioner's newly formed partnership. The memorandum further provided that the proposed purchase of the Movie was attractive not only as an investment but because it offered favorable tax advantages. It estimated depreciation deductions for 1975 totaling $215,000. An investment credit in the amount of $35,000 also was projected. In February 1975, [2] Porter formed a Florida limited partnership, Superman Enterprises, Ltd. (the Partnership), for a 23-year term to expire as of December 31, 1998. The Certificate of Limited Partnership (the certificate), filed with the Florida Department of State on February 19, 1975, stated that the Partnership's business was to distribute and lease a television *168 color videotape entitled "Superman." [3] The certificate provided that in the event of the death of the general partner, if the remaining partner(s) does not admit a new general partner, then the Partnership's business would discontinue and the Partnership would be terminated. [4]
On February 20, 1975, petitioner confirmed in writing his instructions to Porter to organize a limited partnership in which Porter was the general partner and petitioner eventually would become a limited partner. Petitioner also instructed Porter to cause the Partnership to execute a purchase agreement with the Seller in which the Partnership would "acquire all of the right, title and interest in and to" the Movie. Porter was further instructed *169 to cause the Partnership to execute a nonrecourse promissory note, in the amount of $400,000, payable to the Seller, and to deliver petitioner's capital contribution to the Partnership to the designated escrow agent, in accordance with the terms of the escrow agreement referred to therein. Also on February 20, 1975, the Partnership and the Seller executed an agreement (the purchase agreement) in which the Seller agreed to "sell, convey, assign, transfer and deliver" the master 2-hour color television videotape of the Movie to the Partnership, referred to therein as "the Buyer." The terms of the purchase agreement were made expressly subject to the terms of the license agreement between the Seller and ABC. The closing of the purchase agreement was scheduled for 10 a.m., but no later than 6 p.m., on February 21, 1975. The purchase price of the Movie was $500,000, specifically $100,000 in cash or payable by certified check and $400,000 evidenced by a 10-year nonnegotiable, nonrecourse promissory note bearing interest at the rate of 7 percent per annum (the note). There is no copy of the note in the record. The purchase agreement provided that the note was payable "only from receipts" *170 collected by the Partnership with respect to the Movie "as and when received." The term "receipts" was defined as gross receipts collected from the exploitation of the Movie, less residuals, fees and expenses for distribution. The term "net receipts" was defined as receipts less various stated expenses including, but not limited to, prints, advertising, promotion, shipping, financial consulting and general and administrative expenses. The purchase agreement further provided that the Seller was entitled to receive the following amounts of the Movie's net receipts to reduce the outstanding balance of the note: (i) any net Tape proceeds from the two non-prime time showings received or to be received from ABC under the License Agreement attached hereto * * * shall be applied in reduction of said Promissory Note; (ii) the next $50,000.00 of the net Tape proceeds shall be split equally between the Buyer and the payoff on the Promissory Note; (iii) the next $100,000.00 of the net Tape proceeds shall be split between the Buyer (80%) and the payoff on the Promissory Note (20%); (iv) the balance of the net Tape proceeds shall be split 50-50 between the Buyer and the Promissory Note until the *171 Promissory Note has been paid in full and any Tape proceeds thereafter shall go to the Buyer in toto. The sole collateral as security for the note was the Partnership's "right, title and interest in and to * * * [the Movie] and rights thereto * * *." The purchase agreement provided that, should the Partnership default in its full payment of the note plus interest upon its due date, then the Seller had the right to foreclose upon the Partnership's rights, title and interest in the Movie. The Seller attached to the purchase agreement a statement of certification that his production costs for the Movie totaled $227,586.05. He also included a letter dated February 6, 1975, received from Ralph Charell, president of Cawdor and Glamis, Inc., which stated that the Movie was "fully comparable" to specials that cost $450,000 -- $500,000 to produce, and a letter dated February 14, 1975, received from Alvin Cooperman, chairman of the board and CEO of Athena Communications Corporation, which stated that it was "incredible" that the Seller had been able to produce the Movie for $224,000, as "Broadway musicals converted to television have ranged in price from twice that amount to $750,000 for two *172 runs." Petitioner and Porter executed a limited partnership agreement for the formation of the Partnership (the partnership agreement), dated April 18, 1975. Porter was the only general partner and petitioner was the only limited partner listed. [5] The Partnership's stated business purpose was "to acquire the right, title and interest and ownership of the color television video tape entitled 'Superman' * * *." The sole purpose of the Partnership was to acquire the rights to and interests in this one property. Petitioner's partnership interest consisted of ten limited partnership units purchased at $10,000 per unit, for a total cost of $100,000, that is, the amount of the cash portion of the Movie's purchase price. [6] *173 The partnership agreement provided that the general partner possessed "the full and exclusive right and power to manage and operate the Partnership, and to do all things necessary to carry on the business of the Partnership * * *." It also provided that, "[n]o Limited Partner shall take any part in the conduct or control of the Partnership's business nor have any right or authority to act on behalf of the Partnership." A limited partner was not liable to make any additional capital contribution to the Partnership and was not liable for any partnership debt, obligation or loss in excess of his required capital contribution, although he could loan money to the Partnership in his discretion. The Partnership's net profits and losses were to be allocated 99 percent to the limited partners, in proportion to their respective ownership of partnership units, and 1 percent to the general partner. Petitioner remained the sole limited partner at all times. On August 12, 1977, the Partnership executed a letter of intent with Doris Keating and Jill Trump for their exploitation of the Movie until November 12, 1977, later extended until May 12, 1978, for which Keating and Trump were *174 entitled to receive 10 percent of the net proceeds realized therefrom. The agreement was amended sometime between April and June 1978 to include the services of Barry Mahon, a film distributor and Doris Keating's father. As amended, Keating, Trump and Mahon were entitled to receive 45 percent of the gross proceeds realized with respect to the Movie's exploitation. The term of the agreement was extended further until the later of December 31, 1978 or the release in movie theaters of "Superman" (the Superman movie), produced initially by Alexander Salkind and later by Warner Bros., Inc., starring Christopher Reeve as Superman, and Marlon Brando and Gene Hackman, among others. No proceeds were realized with respect to these agreements. On March 22, 1978, the Partnership and Delphian Marketing, Inc. (Delphian) executed an agreement in which the Partnership conveyed to Delphian in perpetuity the right to use the Movie's name, story and characters on clothing, games, posters, housewares, toys, records, books and other goods. On May 2, 1978, the Partnership authorized Delphian to act as the Partnership's agent for a 1-year term to arrange for the Movie's broadcast on television and/or *175 in movie theaters. The Partnership and Delphian each were entitled to receive 50 percent of the net proceeds realized from both of these agreements. No proceeds were realized with respect to these agreements. On September 1, 1978, Porter, the general partner, died. On or about September 15, 1978, petitioner employed the legal services of the law firm of Bushkin, Kopelson, Gaims & Gaines, and authorized it to release copies of the Movie to Warner Bros., Inc., Columbia Pictures Television, NBC, CBS, and WOAB-TV in Ohio for consideration of its syndication. On May 4, 1979, petitioner executed a 7-year television license agreement with Family Entertainment Corporation (FEC) for the television broadcast of the Movie. Gross receipts, after deductions for residuals, were to be divided 40 percent to petitioner and 60 percent to FEC, except that sales within the United States were to be divided 50 percent each. Petitioner received annual statements from FEC, for the reporting periods ended December 31, 1979 through December 31, 1983, which reported the Movie's gross receipts and petitioner's share thereof. Petitioner received a total of $6,735 with respect to this agreement, all of which *176 was realized from foreign television sales. [7] On August 1, 1984, petitioner executed a distribution agreement with John F. Rickert (Rickert) wherein petitioner granted to Rickert the exclusive right to distribute, exploit, lease and exhibit the Movie for a 7-year term; petitioner's license agreement with FEC was terminated as of August 29, 1984. Rickert was entitled to receive 40 percent of any "net royalties," as defined in the distribution agreement. Rickert remained the Movie's distributor as of the date of trial. No proceeds were realized with respect to this agreement. The Movie was broadcast by ABC on February 21, 1975, at 11:30 p.m., as originally scheduled, and again on July 5, 1976, also at 11:30 p.m. ABC did not exercise its option to broadcast the Movie during prime time and did not make any other broadcasts of the Movie. The Superman movie was released in movie theaters in December 1978. The Partnership filed Federal income tax returns, Forms 1065, for the taxable years *177 ended December 31, 1975 through December 31, 1977. It reported zero "gross receipts or sales" for each of the years in issue and net losses, in the amounts of $167,595, $130,690, and $104,473, for 1975, 1976 and 1977, respectively. The Partnership also claimed accrued interest expenses with respect to the note for each year; an investment credit for $500,000 worth of new investment property having a life of 7 or more years; expenses for the amortization of the Movie, reported as "costs of goods sold;" and additional expenses for professional fees, travel and sales expenses. On its returns, the Partnership listed petitioner as its only partner and allocated to him 100 percent of the net losses, deductions and credits reported for each year. Petitioner reported net income from his sole proprietorship as a psychiatrist, in the amounts of $281,860, $178,593, and $188,225, for the 1975, 1976 and 1977 taxable years, respectively. He reported his distributive shares of partnership losses with respect to his interest in the Partnership, in the amounts of $167,595, $102,690, and $104,473, on his 1975, 1976, and 1977 Federal income tax returns, respectively. [8] He also claimed the Partnership's *178 investment credit, in the amount of $50,307, on his 1975 return, which was carried back to his 1972 through 1974 tax returns and carried forward to his 1976 and 1977 tax returns. Respondent's audits of the Partnership's and petitioner's Federal income tax returns filed for the taxable years in issue had commenced as of March 16, 1978 and May 4, 1978, respectively. In the statutory notice of deficiency, respondent disallowed petitioner's deductions of his distributive shares of partnership losses based upon the determination that such losses were not incurred in a trade or business or with respect to property held for the production of income. Respondent also disallowed the investment credit claimed with respect to the Movie based upon the determinations that the Movie did not constitute qualifying property and that petitioner failed to establish his basis in the Movie. OPINION Statute of Limitations
As a preliminary matter, we first address petitioner's argument, raised in the petition, that the *179 statute of limitations bars the assessment of the determined deficiencies for each of the years in issue. Petitioner argues that the statutory notice of deficiency is untimely because it was issued more than 3 years after petitioner filed his Federal income tax returns for each year. Respondent argues that the notice of deficiency was issued within the period of assessment as extended by the written agreements executed by petitioner and respondent for each year. Respondent bears the burden of going forward with evidence that the notice of deficiency has been issued timely. Adler v. Commissioner,85 T.C. 535, 540-541 (1985). The general rule is that there is a 3-year period of limitations after a return is filed in which an assessment of tax may be made. Sec. 6501(a); [9] *180 sec. 301.6501(a)-1, Proced. & Admin. Regs. However, an exception to this general rule provides that, before the expiration of the time prescribed for assessment, the taxpayer and respondent may consent in writing to extend the period for assessment. Sec. 6501(c)(4); sec. 301.6501(c)-1(d), Proced. & Admin. Regs. Petitioner and respondent executed timely Consents to Extend the Time to Assess *181 Tax, Forms 872, and Special Consents to Extend the Time to Assess Tax, Forms 872-A, in accordance with section 6501(c)(4) and the regulations promulgated thereunder. The agreements extended indefinitely the period of limitations for assessment of petitioner's Federal income tax for each of the years in issue. Respondent has met his burden of going forward with the evidence, and petitioner has not presented any argument on brief with respect to why such agreements should not be given their full effect. Petitioner has failed to meet his ultimate burden of proof on this issue. Accordingly, we find for respondent that the statute of limitations does not bar the assessment of the deficiencies determined for any of the years in issue. Profit Objective
During the taxable years in issue, petitioner was the only limited partner in a limited partnership formed to acquire the rights to a made-for-television movie entitled "It's a Bird, It's a Plane. . . It's Superman" adapted from the Broadway musical "Superman" based upon the comic strip character. Petitioner deducted 100 percent of the Partnership's net losses on his Federal income tax returns filed for each of the years in issue and claimed *182 the full amount of the investment credit reported by the Partnership. The primary issue for decision is whether respondent has disallowed properly petitioner's deductions of his distributive shares of partnership losses, deductions for depreciation and the investment credit based upon the determination that the activities of the Partnership were not engaged in for profit. [10]
Respondent argues that the Partnership was not engaged in a trade or business with the bona fide objective of making a profit. *183 He argues that the Partnership was formed and operated solely to achieve tax benefits and that petitioner is not entitled to claim any of the losses, deductions or credits allocated to him by the Partnership. Petitioner argues that the Partnership engaged in its activities with the primary and predominant purpose and objective of making a profit, that the potential for profit from the Movie was "substantial" in relation to its cash investment, and that the Partnership's pre-investment predictions of the Movie's success were reasonable. Petitioner bears the burden of proving that the Partnership's activities were engaged in for profit. Rule 142(a); Welch v. Helvering,290 U.S. 111, 115 (1933). The issue of profit objective must be resolved at the partnership level. Brannen v. Commissioner,722 F.2d 695, 703-704 (11th Cir. 1984), affg. 78 T.C. 471, 501-505 (1982); Siegel v. Commissioner,78 T.C. 659, 698 (1982). The expectation of making a profit need not be reasonable so long as there is a bona fide objective to realize a profit. Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). It must be determined whether there *184 was an "actual and honest profit objective." Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The parties have argued this issue in terms of whether the Partnership's activities were "not engaged in for profit" within the meaning of section 183, [11] *186 which imposes a subjective test. The regulations promulgated under section 183 provide that greater weight is to be given to objective factors and list a series of nonexclusive factors that are normally to be considered to determine one's subjective intent. Sec. 1.183-2(a) and (b), Income Tax Regs.; [12]Jasionowski v. Commissioner,66 T.C. 312, 321 (1976). However, we also have applied an objective test under which transactions have been disregarded for Federal income tax purposes where they are found to be devoid of economic substance consonant with their intended tax effects. See generally Rose v. Commissioner, 88 T.C.     (Feb. 5, 1987) (slip op. at 34-45). As stated therein, it is preferable to analyze certain transactions, engaged in by so-called "generic tax shelters" as here, see Rose v. Commissioner,supra (slip op. at 40-41), under a unified approach emphasizing objective *185 factors, such that -- the objective and subjective tests merge into an approach in which the objective test incorporates factors considered relevant in cases decided under section 183, as well as concepts underlying those statutes providing for the deductions (sections 162 and 167) and credits (sections 38 and 48) in dispute in this case. [Rose v. Commissioner,supra (slip op. at 44).] Although a rather close case, based upon the analysis below of the objective factors of the instant case, specifically, the lack of arm's-length dealings, the inability to exploit the Superman movie, the projected revenue versus tax benefits, the comparison of the Movie's purchase price and its fair market value, and its inflated purchase price due to the *187 nonrecourse financing, we find for respondent that the activities of the Partnership lacked economic substance. [13]
1. Lack of Arm's-Length Dealings
The absence of arm's-length price negotiations is a key indicator of a transaction's lack of economic substance. Rose v. Commissioner,supra (slip op. at 37, 45-46). [14] Prior to the Partnership's acquisition of the Movie, the general partner received a memorandum that outlined the terms of the proposed purchase agreement. [15] *188 The memorandum provided that the Seller had offered to sell the Movie for $500,000, the amount that he had represented as the Movie's approximate fair market value. There is no evidence in the record that the Partnership attempted to negotiate the Movie's purchase price. At the time that the Partnership was formed, petitioner did not have any experience or training in television program distribution. The general partner, upon whom petitioner claims to have relied, also lacked any such formal training. There is no evidence of any effort made on behalf of the Partnership to appraise the Movie's value prior to its acquisition so as to verify the reasonableness of its purchase price. [16] 2. Inability to Exploit the Superman Movie
Petitioner maintains that the "primary purpose" for the formation of the Partnership, to purchase and distribute the Movie, was to exploit the national advertising *189 and publicity of the Superman movie starring Christopher Reeve. Petitioner contends that it originally was anticipated that the Superman movie would be released shortly after the Partnership's purchase of the Movie, that it was not released until 1978 due to unforeseeable delays, and that he had anticipated he would be involved in the Partnership for a maximum of only 1 or 2 years. Petitioner describes the Partnership's purported 3-part plan to exploit the Superman movie as follows: first, to obtain a significant fee from the producers of the Superman movie in exchange for the Partnership's agreement to delay the Movie's television broadcast until after the Superman movie had premiered in movie theaters; second, to broadcast the Movie on television [17] concurrently with the Superman movie's release in movie theaters, to take advantage of its anticipated national advertising; and third, to realize additional revenue from domestic and foreign television reruns of the Movie. Respondent correctly argues that the Partnership would not have been able to benefit from any such purported exploitation of the Superman movie because of ABC's exclusive rights to the Movie's broadcast during the *190 period in which the Superman movie's release originally had been expected. The Partnership purchased the Movie subject to the terms of an existing license agreement between the Seller and the ABC television network. ABC had acquired the exclusive right to broadcast the Movie during the first 18 months of the Partnership's interest, with the option to extend the term of the license agreement for an additional 6 months, that is, for a full 2 years from the Partnership's purchase of the Movie. More importantly, the Movie was scheduled to be broadcast, and in fact was first broadcast, by ABC on February 21, 1975, the closing date of the purchase agreement. This directly contradicts any purported plan to obtain a fee to postpone the Movie's broadcast until after the release of the Superman movie. [18] We reject petitioner's argument that a bona fide profit objective was founded upon a plan to exploit the Superman movie. Petitioner admits *191 on brief that based solely upon the Movie's own merits, excluding any exploitation of the Superman movie, its income potential was "undetermined" and its prospects for success were "uncertain." While it may be sheer coincidence, we cannot help noting that the efforts to exploit the Movie dramatically increased after petitioner became aware, as of March and May 1978, that the Partnership's and his returns, respectively, were being audited by respondent. We add that, as discussed below, it was obvious from the outset that the Movie would not generate enough revenue to cover the cost of the Movie, much less enable the Partnership to realize a profit from its exploitation. 3. Projected Revenue Versus Tax Benefits
The memorandum that outlined the terms of the proposed purchase agreement also projected the revenue and tax benefits with respect to the Partnership's exploitation of the Movie. It reveals that the venture's anticipated tax benefits far exceeded its projected income. The total revenue projected from the Movie's exploitation was $220,000, to be realized over a 5-year period. However, this amount includes a $140,000 license fee payment by ABC, which amount was payable only in *192 the event that ABC exercised its option to broadcast the Movie during prime time. The Partnership was aware that, if ABC were to exercise its option, then $103,000 of the option price would be paid to the Movie's authors, musicians, cast director and producer rather than to the Partnership, and this fact was reiterated in the memorandum. Therefore, of the total revenue projected, the Partnership could have expected to receive only $117,000, that is, $220,000 less $103,000. Moreover, the terms of the purchase agreement provide that a portion of the Partnership's net receipts realized from the Movie's exploitation were required to be paid to the Seller as payments upon the promissory note, in accordance with a specific formula set forth therein. [19] *193 In comparison, the memorandum projected substantial tax benefits to be realized from the Movie's exploitation. Petitioner contends that his accountant advised him against investing in the Movie if he were interested in it as a tax shelter. However, the memorandum specifically stated that the Movie offered "attractive" tax incentives based upon projected depreciation deductions, in the amount of $215,000, plus an investment credit, in the amount of $35,000, for a total of $250,000, in just the first year of the Partnership. The Partnership allocated 100 percent of its losses, deductions and credits to petitioner. In 1975, the Partnership reported net losses from depreciation deductions, accrued interest on the note and other miscellaneous expenses in excess of $165,000, and claimed an investment credit in excess of $50,000. In both 1976 and 1977, the Partnership reported net losses from depreciation deductions and accrued expenses in excess of $100,000. Not surprisingly, the *194 Partnership reported zero gross receipts or sales for each year in issue. [20] ABC did not exercise its option to broadcast the Movie during prime time, and petitioner received a total of only $6,735 from the Movie's exploitation, realized for the 1979 through 1983 taxable years. Clearly, petitioner's $100,000 capital contribution was paid for the purchase of anticipated tax benefits to offset his income from other sources. [21]
4. Comparison of Purchase Price and Fair Market Value
Although the Partnership did not obtain any independent appraisal of the Movie's value prior to its purchase, petitioner presented several witnesses at trial who testified that, at the time of the Partnership's purchase, the Movie's fair market value was equal to or in excess of its purchase price. The three experts who appeared on petitioner's behalf valued the Movie *195 as of 1975 from $500,000 -- $700,000, whereas respondent's one expert determined that it was worth only $25,000 to the Partnership. Petitioner's first expert, John Felton, is a vice-president of programming for a television station affiliated with the Public Broadcasting System. Although he valued the rights to distribute the Movie nationally at $750,000, at trial we ruled that petitioner had failed to establish that Felton qualified as an expert to value production costs [22] or to determine what a purchaser would have paid in 1975 for all of the rights to the Movie. Petitioner has shown him to be qualfied as an expert solely for his opinion of the amount that his station would have paid in 1975 for its rights to broadcast the Movie, which he has valued at $3,000 -- $4,000. Petitioner's second expert, John Rickert, is a movie producer with expertise in movie distribution in theaters and on television. He became the Movie's distributor pursuant to an agreement dated August 1, 1984 and remained so employed at the time of trial. He has valued the Movie at its $500,000 *196 purchase price, based upon its well-known Superman theme, and attributes its financial failure to the Partnership's poor distribution efforts. Petitioner's final expert is Sheldon Schermer, a television film distributor. He has valued the Movie at $700,000, after commissions and other expenses, based upon his projected sales of advertising "spots" during the Movie's broadcast. Respondent's only expert, A. Frank Reel, whose expertise is in television programming, distribution and production, has valued the Movie to the Partnership at only $25,000 based upon projected income from its foreign distribution. He places no value on the Movie for its domestic distribution based upon the assumption that the residual payments would be prohibitive. Petitioner's experts, Rickert and Schermer, have substantially overstated the Movie's value. Their appraisals fail to consider certain factors critical to the Partnership's ability to exploit and realize income from the Movie. The Partnership purchased the Movie expressly subject to the terms of a license agreement previously executed between the Seller of the Movie and the ABC television network. ABC had acquired the exclusive right to broadcast *197 the Movie in the United States for a period of time that included the first 18 months of the Partnership's interest, with the option to extend the term of its license for an additional 6 months. We agree with respondent's expert that ABC's exclusive license for the Movie's broadcast restricted the Partnership from distributing the Movie in the United States during the term of the license agreement. On cross-examination Rickert acknowledged that ABC's rights lessened his appraised value of the Movie. Additionally, the purchase agreement executed by the Partnership and the Seller provides that the Seller is entitled to receive specific amounts of the Partnership's net receipts realized from the Movie as payments upon the Partnership's promissory note to the Seller. The purchase agreement provides that the note was payable "only from receipts" to the Partnership realized with respect to the Movie's exploitation. [23] Petitioner's experts fail to distinguish between the Movie's fair market value and its value to the Partnership. We reject *198 petitioner's experts' appraisals of the Movie's fair market value but find that it is unnecessary to determine the exact value of the Movie as of the time of the Partnership's purchase. We conclude that its fair market value to the Partnership did not exceed the amount of the projected revenue to the Partnership, see Estate of Baron v. Commissioner,83 T.C. 542, 552 (1984), affd. 798 F.2d 65 (2d Cir. 1986), which ranged from $25,000, as respondent posits, to $117,000, as projected in the memorandum discussed above, which in any event did not reasonably approximate the Movie's $500,000 purchase price. 5. Nonrecourse Financing
The presence of a deferred debt that is not likely to be paid is an indicia of lack of economic substance. Rose v. Commissioner,supra (slip op. at 51-52 and cases cited therein). The existence of a highly inflated purchase price based upon a nonrecourse note may contribute to the finding that the activity was not entered into for profit. Flowers v. Commissioner,80 T.C. 914, 937 (1983). In the instant case, 80 percent of the Movie's cost is evidenced by a nonnegotiable nonrecourse note. Respondent argues that the note does not constitute a valid debt because *199 it unreasonably exceeds the Movie's fair market value. Respondent maintains that the sole purpose of the note is to artificially inflate the Movie's purchase price, thereby increasing the tax benefits of the transaction. Petitioner argues that the note does constitute a valid debt. We are not persuaded by petitioner's experts' testimony that the Movie's fair market value as of 1975 reasonably approximated its purchase price, as stated above, or the amount of the note. [24] Moreover, we do not believe that there was a reasonable possibility that the note would be paid. The purchase agreement provides that the note is payable only out of net receipts from the Movie "if and when received," that is, after residuals, fees and other expenses incurred with respect to the Movie's exploitation. Based upon the formula set forth in the purchase agreement, the Movie would have to realize gross receipts far in excess of the originally *200 projected $220,000 in order for the Partnership to satisfy the note. [25] *201 Payments on the note not only were uncertain but also were contingent upon the Partnership's ability to exploit the Movie with an unreasonable degree of success. The sole collateral securing the note consists of the Partnership's rights to and interest in the Movie. Inasmuch as in just the first year of the Partnership its tax benefits to petitioner exceeded his entire capital contribution, the threat of the Seller's foreclosure on the note provided little economic incentive for the Partnership to make payments on the note. Implicit in our conclusion that the note does not constitute a genuine debt is that petitioner is not entitled to deduct any interest purportedly accrued thereon. [26]Fox v. Commissioner,80 T.C. 972, 1019 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Zemel v. Commissioner,734 F.2d 9 (3d Cir. 1984), affd. without published opinion sub nom. Rosenblatt v. Commissioner,734 F.2d 7 (3d Cir. 1984), affd. without published opinion sub nom. Krasta v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Leffel v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner,734 F.2d 5 (3d Cir. 1984); *202 Flowers v. Commissioner,80 T.C. 914, 942-943 (1983). We conclude that the activities of the Partnership were devoid of economic substance consonant with their intended tax effects. Inasmuch as section 167(a) allows a deduction for depreciation only with respect to property either used in a trade or business or held for the production of income, and section 48(a)(1) provides that only property with respect to which depreciation is allowable qualifies for the investment credit thereunder, petitioner's right to the Partnership's reported depreciation deductions and investment credit also depends upon his showing, at a minimum, that the activities of the Partnership were entered into with an *203 actual and honest profit objective. Taube v. Commissioner, 88 T.C.     (Feb. 26, 1987) (slip op. at 22). Therefore, we need not engage in separate analyses to sustain respondent's disallowances of petitioner's claimed depreciation deductions [27] and investment credit. See also Rose v. Commissioner,supra (slip op. at 53-56). Accordingly, we hold that respondent has disallowed properly the losses, deductions and credits claimed by petitioner with respect to his interest in the Partnership for each of the years in issue. [28] *204 Decision will be entered under Rule 155.
Footnotes
1. The memorandum was received from "MED," presumably Maurice E. Donsky (Donsky), another partner in Porter's law firm of Porter, Treister, Donsky and Stewart.↩
2. The Partnership's 1975 Federal income tax return reported February 20, 1975 as the date that it commenced business although its 1976 and 1977 returns reported February 10, 1975 as such date. ↩
3. The certificate listed Porter as the Partnership's only general partner and Donsky as its only limited partner. See n. 1, supra.↩
4. The Certificate of Authority issued to the Partnership by the Florida Department of State expired on December 31, 1975 and was cancelled on September 14, 1976.↩
5. An amendment to the Certificate of Limited Partnership, dated March 5, 1975 and filed with the Florida Department of State on May 8, 1975, provided that Donsky, the former limited partner, had "sold, bargained, assigned and transferred all of his rights, title and interest as a Limited Partner" in the Partnership to petitioner. See n. 3, supra.↩
6. There is no executed note, cancelled check, or other written receipt in the record as evidence of petitioner's $100,000 capital contribution.
7. Petitioner's total receipts were derived as follows: 1979
1980
1981
1983
Total
$1,935
$1,520
$1,600
$1,680
$6,735
There is no statement in the record from FEC for the reporting period ended December 31, 1982.↩
8. Petitioner reported net income from his sole proprietorship as a psychiatrist, in the amounts of $57,525, $94,890, and $118,436, for the 1972, 1973, and 1974 taxable years, respectively.↩
9. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Section 6501 provides in relevant part as follows: SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule. -- Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * *, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. * * * (c) Exceptions. -- * * * (4) Extension by agreement. -- Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title * * * both the Secretary and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.↩
10. In the statutory notice of deficiency, respondent alternatively disallowed petitioner's deductions of certain expenses claimed by the Partnership for depreciation, interest on its promissory note, professional fees for the preparation of the Partnership's tax returns, and travel and sales expenses. At trial, respondent also argued that certain of these expenses were not properly substantiated. Respondent further alternatively determined that the note was not includable in petitioner's partnership basis because it lacked economic substance and did not represent a bona fide debt. Based upon our disposition of respondent's primary argument we need not address his alternative positions.↩
11. Section 183(a) provides the general rule that, in the case of an activity not engaged in for profit, no deduction attributable to such activity shall be allowed except as provided in section 183(b). Section 183(b)(1) provides that there shall be allowed those deductions that would be allowable without regard to whether the activity is engaged in for profit, and section 183(b)(2) provides that deductions that would be allowable if the activity were engaged in for profit shall be allowed only to the extent that the gross income derived from the activity exceeds the deductions allowable under section 183(b)(1). Section 183(c) defines the term "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." 12. Section 1.183-2(b), Income Tax Regs.↩, lists the following factors to be considered, in addition to all of the facts and circumstances surrounding the activity, in this determination: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his or her advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits earned, if any; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation involved in the activity.
13. We note that the same result would have been reached based upon the subjective intent analysis of section 183, focusing upon petitioner's lack of profit objective. References to the relevant factors listed in the regulations promulgated under section 183↩ are noted.
14. See also Helba v. Commissioner,87 T.C. 983 (1986); Jaros v. Commissioner,T.C. Memo. 1985-31↩. 15. This memorandum was received in evidence to establish the information provided to the general partner prior to the Movie's purchase but not to establish the truth of any information stated therein.
16. Petitioner's failure to attempt to obtain any advice of experts and his mere acceptance of information furnished by the Seller also indicate that the Partnership's activities were conducted in an unbusinesslike manner. See also sec. 1.183-2(b)(1) and (2), Income Tax Regs.↩
17. It has not been established that the Partnership possessed any legal rights to display the Movie in movie theaters.↩
18. Petitioner had testified that, apparently sometime during or after 1978, he was offered $25,000 from Warner Bros., Inc. as a "nuisance fee."↩
19. The purchase agreement provides that the Seller is to be paid (i) 50 percent of the first $50,000 of net receipts, (ii) 20 percent of the next $100,000 of net receipts, and (iii) 50 percent of any subsequent net receipts until the note is satisfied. Therefore, the Partnership would be entitled to retain only $78,600 of the $117,000 revenue received, that is, 50 percent of the first $50,000, or $25,000, plus 80 percent of the remaining $67,000, or $53,600. The proceeds would reduce the Partnership's note to the Seller by only $38,400, that is, 50 percent of the first $50,000, or $25,000, plus 20 percent of the remaining $67,000, or $13,400.
20. We also note that section 183(b)(2) provides that deductions that would be allowable if the activity were engaged in for profit are allowable only to the extent that the gross income derived from the activity exceeds the deductions allowable under section 183(b)(1). See n. 11, supra.↩
21. See also sec. 1.183-2(b)(6), (7) and (8), Income Tax Regs.↩
22. We also would question his method of valuation, which equated the Movie's fair market value with its production costs.↩
23. The parties disagree whether the principal amount of the note was to be reduced by the amount of ABC's license fee paid to the Seller. See n. 25, infra.↩
24. We find it unnecessary to resolve whether the Movie's fair market value to the Partnership should be measured against the purchase price or the amount of the note. See Estate of Baron v. Commissioner,83 T.C. 542, 548 n.26 (1984), affd. 798 F.2d 65↩ (2d Cir. 1986).
25. For purposes of determining any adjustment to petitioner's partnership basis with respect to the note, in accordance with section 752, respondent interprets the terms of the purchase agreement to provide that the $400,000 principal amount is reduced by the full amount of ABC's $170,000 license fee paid to the Seller. Petitioner disagrees with respondent's position and argues that the purchase agreement is "at best unclear" on this point. Although we need not resolve this disagreement, we note that the partnership would have to realize net receipts from the Movie totaling $860,000 under petitioner's position (50 percent of $50,000, or $25,000, plus 20 percent of $100,000, or $20,000, plus 50 percent of $710,000, or $355,000) in order to satisfy the $400,000 note principal, or net receipts in the amount of $520,000 under respondent's position (50 percent of $50,000, or $25,000, plus 20 percent of $100,000, or $20,000, plus 50 percent of $370,000, or $185,000) in order to satisfy the $230,000 note principal.
26. The parties have stipulated that the Partnership and petitioner "use the cash basis method of accounting." However, petitioner does not argue, or present any evidence that might substantiate, that any interest payments were made during the years in issue. Instead, petitioner argues that the stipulation refers only to the Partnership's method of accounting for taxable years after the death of its general partner in 1978, but that the Partnership used the accrual method during the years in issue.↩
27. In the notice of deficiency, respondent disallowed the claimed depreciation deductions as "Cost of Goods Sold (Amortization of TV Video Tape)," which he acknowledges on brief is poor language for the disallowance of depreciation deductions or amortization expenses. However, we need not resolve whether the disallowance of depreciation deductions constitutes a new matter, thereby shifting to respondent the burden of going forward with the evidence, under Rule 142(a), inasmuch as the record establishes that, in any event, petitioner is not entitled to deduct such amounts. ↩
28. In the notice of deficiency, respondent disallowed $130,690 as petitioner's distributive share of partnership losses for 1976, the amount of the Partnership's net losses allocated to petitioner. However, petitioner claimed only $102,690 as his share of partnership losses for this year, apparently excluding $28,000 of interest expenses reported on the Partnership return. Therefore, an appropriate adjustment is necessary in the parties' computations under Rule 155 to determine the proper amount of the deficiency for 1976.