**WALT DISNEY PRODUCTIONS,**
**Appellee,**

v.

**UNITED STATES of America, Appellant.**

**No. 76–1114.**

United States Court of Appeals,
Ninth Circuit.

Aug. 5, 1976.

As Amended Jan. 18, 1977.

Gilbert W. Rubloff, Atty. (argued), Tax Div., U. S. Dept. of Justice, Washington, D. C., for appellant.

John Cooley Baity (argued), of Donovan, Leisure, Newton & Irving, New York City, for appellee.

Before CHAMBERS and GOODWIN, Circuit Judges, and SCHNACKE,* District Judge.

ALFRED T. GOODWIN, Circuit Judge:

Walt Disney Productions sued for a tax refund, claiming the investment tax credit under 26 U.S.C. §§ 38, 46–50 (1970), for the cost of fourteen film negatives produced in 1970. The district court granted the refund, and rejected two government counterclaims. We affirm in part, and remand for further hearing on one of the counterclaims.

Some understanding of motion picture technology is necessary before we discuss the statute which grants qualified taxpayers an investment tax credit. Although the end product (an exhibition print) will provide both sound and a moving picture when projected, the audio and video portions of a film are separately processed in the initial stages of production. From the filming and editing of the original film negatives, a cut-picture negative (which does not contain sound) is produced. Meanwhile, audio experts record, edit, and mix three different types of sound tapes (music, dialogue, and sound effects), synchronize those sounds with a working print of the film, and then combine the synchronized and edited tapes into a magnetic master sound tape. At this point, the video (cut-picture negative) and audio (master sound tape) portions of the film are still separate. The master sound tape and the cut-picture negative (hereafter called collectively the "master negative") are durable items, and the steps necessary to produce them need not be repeated to create exhibition prints. It is for the production costs of the master negative that Disney seeks the investment tax credit.

Since commercial movie projectors play sound from optically recorded sound tracks, rather than from magnetic tapes, an optical sound negative is produced from the magnetic master sound tape. The optical sound negative in combination with either the cut-picture negative or an intermediate printing item (e. g., duplicate negative, color reversal internegative, or matrix) which is produced from the cut-picture negative, is then used to make an "answer print" for viewing by Disney's executives. The term "completion negatives" will refer to the items derivable from the cut-picture negative and the magnetic master which are used directly to strike exhibition prints.

The "answer print," when approved by the executives, represents the version to be exhibited. Equivalents of that print (positive release exhibition prints) are then made using the cut-picture negative (or an intermediate printing item) together with an optical sound negative. Unlike the master negative (the cut-picture negative and magnetic master sound tape), the completion negatives (optical sound negatives and intermediate printing items) are short lived. They can be used to make an average of only 100 to 150 exhibition prints. Accordingly, Disney must periodically use the master negative to provide new completion negatives for the production of exhibition prints. To preserve the value of the exhibition rights, Disney secures a statutory copyright on the photoplay (the picture image

---

* The Honorable Robert H. Schnacke, United States District Judge for the Northern District of California, sitting by designation.

and sound) of each exhibition print. See 17 U.S.C. §§ 1, 5(*l*), 10 & 13 (1970). The complete process of production is outlined in the sketch opposite.[1]

1.

POSITIVE RELEASE EXHIBITION PRINTS

ANSWER PRINT

(C)

(B) (B)

INTERMEDIATE OPTICAL
PRINTING SOUND
ARTICLES NEGATIVES

(A) (A)

CUT-PICTURE NEGATIVE MAGNETIC MASTER SOUND TAPE

synchronized, but not com-
bined with, the picture
work print

editing editing
from the work print

ORIGINAL DIALOGUE MUSIC SOUND
NEGATIVES TAPE TAPE EFFECTS
 TAPE

VIDEO AUDIO

(A)
 The cut-picture negative and magnetic master sound tape are the property for which Disney claims the investment tax credit and will be referred to collectively as the "master negative."

(B)
 Intermediate printing articles include duplicate negatives, matrixes, color reversal internegatives, and other articles derived from the cut-picture negative. These articles and the optical sound negatives constitute the "completion negatives."

(C)
 The optical sound negative can be combined with either the cut-picture negative itself or with the inter-mediate printing articles to produce the exhibition prints.

In calculating the investment credit, Disney claims all the capitalized costs [2] necessary to produce the master negative; it does not claim the costs incurred in producing the completion negatives. Disney does not claim as investment-credit property the original or edited dialogue, music, or sound-effects tapes, but Disney does claim the expense for those items in computing the production costs of the master negative.

In calculating the basis for depreciation of the film titles, Disney capitalized the costs of producing its answer prints,[3] including the costs of the optical sound negatives[4] but not including the costs of the intermediate printing articles. In depreciating each film title, Disney uses the income-forecast method[5]—a scheme generally used for depreciating intangible personal property.

### I.

On its tax return for fiscal year 1970, Disney claimed, as it had for all prior years since 1962, an investment tax credit equal to seven percent of its alleged qualified investment in the master negatives produced during that taxable year.

The Commissioner disallowed the investment tax credit on the ground that Disney's production costs were investments in intangible property: a copyright-protected motion picture. The government maintains that, while a master negative includes tangible items (such as film stock and tapes), these tangible "things" have no separate identities or depreciation bases for tax purposes apart from the photoplay and intangible rights included in the finished product.

The master negatives in issue here are the same type of property we earlier characterized as qualifying for the investment tax credit. *Walt Disney Productions v. United States,* 327 F.Supp. 189 (C.D.Cal. 1971), *aff'd as modified,* 480 F.2d 66 (9th Cir. 1973), *cert. denied,* 415 U.S. 934, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974) (*Disney I*); *Walt Disney Productions v. United States,* 1974–2 U.S. Tax Cas. ¶ 9623 (C.D.Cal.1974), *appeal dismissed per stipulation,* No. 74–2988 (9th Cir. Jan. 17, 1975) (*Disney II*).

Since *Disney I & II* concerned different master negatives and different taxable years than those in issue here, the present case lies outside the narrow scope of res judicata and collateral estoppel applicable to tax litigation. *See Commissioner v. Sunnen,* 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948). However, the earlier holdings have value as precedent and are binding upon this court until overruled by this court en banc or by the Supreme Court.

 First, we agree with *Disney I* that master negatives are tangible property within the meaning of 26 U.S.C. § 48(a)(1) (1970) and that the investment tax credit can be claimed for the production costs of such property. Disney can claim the full 7% credit on the costs in issue here because the parties have stipulated that the elements of the master negative (the cut-picture negative and master sound tape) have

---

**2.** These costs include: preparing a script from a story; building sets; hiring and rehearsing talent; and editing the original film negatives and "mixing" the audio (dialogue, music, and sound effects) tapes to produce the cut-picture negative and magnetic master sound tape.

**3.** Neither for investment tax credit nor for depreciation purposes does Disney claim costs beyond creation of the answer print. Costs necessary to produce the exhibition prints themselves are not claimed and the depreciation of those prints as they are used is not in issue here.

**4.** The parties stipulated in the pretrial order that the depreciation basis includes the cost of the optical sound negatives. Disney does not claim the cost of the optical sound negatives in seeking the investment credit.

**5.** Under this method, production costs are recovered ratably as the income from the exhibition or other use of each exhibition print is realized.

a useful life of more than eight years. See 26 U.S.C. § 46(c)(2) (1970).

■ The master negatives for each film title are used by Disney as a capital asset to create exhibition prints for rental or sale. Most of the value of the exhibition prints rests on the right of exclusive exploitation protected by copyright, but that fact does not render the capital asset (the master negatives) an intangible. A machine which stamps out patented products for sale is tangible. The character of the acquisition costs of that machine is not affected by the character of the end product, even if the value of the entire system is dependent on the patent, i. e., an intangible.

■ Second, the government asserts that, for purposes of depreciation, Disney has treated its film property as an intangible by including in the depreciation basis costs beyond those required to produce the master negative and by using the income-forecast method of depreciation. Noting that this court held in *Disney I* that basis for the investment tax credit does not have an idiosyncratic meaning and that the court therefore authorized use of the full depreciation basis in calculation of the credit,[6] 480 F.2d at 69, the government argues that when for purposes of depreciation Disney treats its film property as an intangible, that property should also be treated as an intangible when Disney seeks the investment tax credit.

Although the basis Disney now claims for depreciation differs in amount from that claimed for the investment credit, this difference does not demonstrate that Disney is actually seeking the credit for an intangible (a motion picture). We believe that the appropriate property for purposes of the credit is the master negative for each film

title. Inclusion of the optical sound negative's costs in the basis of the depreciable property and the use of the income-forecast method of depreciation may suggest that for the purposes of depreciation Disney treats its property as an intangible. Yet, assuming that treatment, it does not convince us that for purposes of the credit the relevant property is an intangible picture rather than tangible master negatives. The error, if any, in Disney's inconsistent treatment lies in its calculation of the depreciation basis.[7]

The legislative history which we noted in *Disney I* also persuades us that Congress intended Disney's master negatives to be eligible for the credit. Congress was aware of the problems of the film industry again in 1971 when it reenacted the credit first enacted in 1962. This legislative history gives weight to the views expressed on reenactment. See *Disney I,* 480 F.2d at 68–69.

We note that another court has recently wrestled with the problems of defining tangible property for purposes of the investment tax credit where the value of the property to be characterized rested on a right of exclusive exploitation. In that case, a district court held that computer tapes, although storing seismological information gathered at great expense, could not be treated as tangible property for investment-credit purposes because the value in the property was not in the tapes, but in the exclusive intangible information stored on the tapes. *Texas Instruments v. United States,* 407 F.Supp. 1326 (N.D.Tex.1976). The *Texas Instruments* case is not compatible with *Disney I, supra,* even though it can be distinguished on its facts. We believe, however, that we are more nearly following the expressed intent of Congress if we treat the property before us in this case, the cut-picture negative and master sound

---

6. *Disney I* was not asked to decide, and did not decide, the tax consequences of claiming the investment tax credit on less than all of the depreciable property upon which it was claimed in that case.

7. We need not now decide whether for purposes of computing the depreciation basis, Disney must exclude the cost of the optical sound negatives. That issue is not before us.

tapes, as tangible property for investment tax credit purposes.

## II.

■ The government also contended that even if Disney's production costs could qualify for the credit, a portion of the credit allowed for prior taxable years was subject to recapture because the motion pictures involved were exhibited predominantly outside the United States in fiscal 1970. See 26 U.S.C. § 48(a)(2)(A) (1970). The government would have us construe predominant foreign use during a taxable year as to each film title to mean generation of more than 50 percent of that title's gross receipts from foreign exhibition. In 1970, more than 50 percent of Disney's gross receipts from exhibition of prints produced from 1962–69 master negatives came from foreign sources.

In so arguing, the government stumbles over its own regulation which provides that if the property is physically located outside the United States during more than 50 percent of the year, such property shall be considered used predominantly outside the United States. Treas.Reg. § 1.48–1(g)(i). Disney's master negatives remained physically located in the United States at all times in question. Only the exhibition prints went on tour.

The relevant use of a productive asset (the master negatives) lies in that asset's manufacturing role (creation of exhibition prints). The master negatives were kept for use in the United States; however, some exhibition prints were made abroad using certain completion negatives physically located there. That the end product was marketed in foreign countries does not alter the fact that the production occurred within this country. We see no reason to disregard the tax regulation and adopt the government's somewhat strained definition of predominant use.

## III.

■ The government's final argument concerns its claim that Disney took excessive depreciation for its negatives. The district court did not determine the merits of that claim. Instead, the court held that the government was barred from claiming an offset because it had failed to issue a notice of deficiency. After the notice of appeal had been filed, the parties filed a joint memorandum in the district court noting that under *Lewis v. Reynolds,* 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 (1932), the government can claim an offset against a taxpayer's action for refund without resorting to the deficiency procedures. Because the appeal was pending, the district court took no further action on the question.

We agree with the parties that it was error to bar the government's excessive depreciation claim. We have no opinion upon the merits of that claim, but remand it to the district court for further proceedings there.

Except for the remand for the purpose noted, the judgment is affirmed.

SCHNACKE, District Judge (concurring):

Were this a case of first impression, it would be my view that a master tape is merely one of several convenient assembly points for a variety of valuable intangibles, and hold that it did not constitute tangible property entitled to the investment tax credit. *Texas Instruments v. United States,* 407 F.Supp. 1326 (N.D.Tex.1976). But the circumstances here are indistinguishable from what the majority opinion calls Disney I and Disney II, and under the compulsion of those cases, I must concur.