**BING CROSBY PRODUCTIONS, INC.,**
Plaintiff-Appellee,

v.

**UNITED STATES of America,**
Defendant-Appellant.

**SUSSEX PICTURES, INC.,**
Plaintiff-Appellee,

v.

**UNITED STATES of America,**
Defendant-Appellant.

**MCA INC. and Universal City Studios,**
Inc., Plaintiffs-Appellees,

v.

**UNITED STATES of America,**
Defendant-Appellant.

Nos. 76–1570, 76–2202 and 77–3054.

United States Court of Appeals,
Ninth Circuit.

Jan. 4, 1979.

Ann B. Durney, Atty. (argued), Dept. of Justice, Washington, D.C., for defendant-appellant.

Bernard J. Long, Jr. (argued), of Dow, Lohnes & Albertson, Washington, D.C., Carl A. Stutsman, Jr. (argued), Los Angeles, Cal., John C. Baity (argued), of Donovan, Leisure, Newton & Irvine, Los Angeles, Cal., for plaintiffs-appellees.

Before ANDERSON and HUG, Circuit Judges, and EAST,* District Judge.

J. BLAINE ANDERSON, Circuit Judge:

## I. PROCEEDINGS BELOW

The companies involved in these appeals, Bing Crosby Productions (Bing Crosby or BCP), Sussex Pictures (Sussex), and MCA and Universal City Studios (MCA), brought refund suits in district court for their income taxes paid in the 1960's. Jurisdiction of the district court was based on 28 U.S.C. § 1340. Summary judgment was granted in all three cases in favor of the taxpayers. They were found to be entitled to an investment credit pursuant to 26 U.S.C. §§ 38, 46–50 for various production costs incurred in the production of films for television and movie theaters. The government made timely appeals, and the jurisdiction of this court is based on 28 U.S.C. § 1291. All three cases present similar issues.

## II. FACTUAL BACKGROUND

### A. OVERVIEW OF MOTION PICTURE AND TELEVISION INDUSTRY.

The different companies in the motion picture and television industry use a similar process in the production of the film which is ultimately shown at movie theaters, by the networks, or by individual television stations. However, some companies utilize a slightly distinguishable process in the storage and retention of the printing articles which are used in the manufacture of the exhibit prints which are then shown to the public. In the present cases, MCA uses a different technique than Bing Crosby or Sussex. On appeal, the government is attempting to make this distinction the determinative issue in answering the question as to whether motion picture and film companies are entitled to the investment credit. An explanation of the manufacturing process will clarify the issues presented by these appeals.

The manufacturing of the prints which are actually shown to the public should be viewed in a vertical framework. For explanation purposes, a three-step analysis best serves to illustrate this:

Step (1): When a program or movie is shot, the video and audio portions are each recorded and then edited separately. The sound portion consists of three parts (dialogue, music, and sound effects) which are combined and edited into a finished version referred to as the master sound tape or magnetic master. The visual portion is edited into a cut picture negative which is also referred to as the original picture negative. These final edited versions of the audio and visual portions are called the master negatives or simply the negative elements.

Step (2): From the respective master negatives, various intermediate or secondary film and tape articles are made. These consist of 16 and 35mm negatives of the video portion (duplicate picture negatives or duplicate action negatives). The sound portion is recorded on 16 and 35mm tapes (optical sound track negatives). Although they actually go a step further by combining the sound and picture, answer prints and protective masters are included within this category. Also included are various duplicate sound tapes which are made and retained by the production companies. The distinguishing feature of this category is that the films and tapes contained within it

---

* The Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

are generally the ones which are either used by the company to manufacture the release prints in step # 3, or are items which are made from the master negatives and retained by the company to make other intermediate printing articles.

Step (3): The final step involves the actual manufacture of the release prints (exhibit or composite release prints). These combine the audio and visual portions onto a single property, which are then shown at movie theaters, by television networks, or by individual television stations. The release prints are generally struck from the different intermediate articles contained within step # 2.

The release prints in step # 3 generally have a short useful life which would preclude them from qualifying for the investment credit. They are shown several times and then retired. The intermediate prints in step # 2, on the other hand, may have a useful life which satisfies the statutory requirement; although some companies use them so extensively for the manufacture of the exhibit prints that they are also retired short of the statutory period (both Walt Disney and MCA appear to do this). It should also be pointed out that some companies do not retain the master negatives in step # 1, since they instead rely on their negatives in step # 2 for the manufacture of all subsequent release prints. Because of these differing techniques, the different companies involved in these appeals claim that the investment credit should be applied to different printing articles retained by each. The chief distinction lies in the fact that MCA claims the credit for its printing articles in step # 1, and Bing Crosby and Sussex claim the credit should be allowed for various articles in step # 2.

## B. BING CROSBY PRODUCTIONS, INC. v. UNITED STATES, No. 76–1570.

Bing Crosby brought this action for refund of federal income taxes for fiscal years 1962 through 1967. Bing Crosby claimed entitlement to investment tax credits in respect to the costs incurred in pro-

ducing five television programs (Ben Casey, Breaking Point, The Bing Crosby Show, Hogan's Heroes, and Slattery's People). All five of the programs were broadcast on domestic networks and syndicated abroad. BCP claims the investment credit for the costs resulting from the production of six printing articles which it retains for each of the programs:

1. the original 35mm picture negative;
2. one 16mm duplicate picture negative;
3. the protective master;
4. one 16mm sound negative;
5. one 35mm sound negative; and
6. a magnetic sound tape.

The original 35mm picture negative (No. 1 above) is an article from the first step of the production process as previously explained. The other five articles are all considered secondary printing articles from the second step of the production process.

## C. SUSSEX PICTURES, INC. v. UNITED STATES, No. 76–2202.

Sussex brought this action for refund of federal income taxes for fiscal years 1963 through 1970. Sussex claimed entitlement to an investment credit for the costs incurred in the production of several episodes of the "Rifleman," a television series. Sussex claims the investment credit for the costs resulting from the production of five printing articles which it retains from each episode:

(1) the 35mm cut picture negative (the original edited negative containing only a picture);
(2) the 35mm protective master (a positive print containing both picture and sound);
(3) the 16mm reduction duplicate negative (a duplicate negative, containing only a picture);
(4) the 35mm optical sound negative (a negative containing only sound); and
(5) the 16mm optical sound negative (a negative containing only sound).

The first article, the 35mm cut picture negative, comes within step # 1 of the production process. The other items are all secondary articles from the second step of the

production process. Since 1963 Sussex has syndicated the "Rifleman" with both domestic and foreign television stations.

### D. MCA INC. AND UNIVERSAL CITY STUDIOS, INC. v. UNITED STATES, No. 77–3054.

MCA brought this action for refund of federal income taxes for tax years 1962 through 1970. Taxpayers claimed entitlement to an investment tax credit for costs incurred in the production of several different motion pictures and television programs. MCA utilizes a production process different from Bing Crosby or Sussex. It retains the cut picture negative and master sound tape for each film. These are used to manufacture both secondary printing articles (step # 2) and exhibit prints (step # 3). MCA only claims the investment tax credit for the master negatives from step # 1 of the production process.

### III. DISCUSSION

An investment tax credit, as originally passed by Congress as part of the Internal Revenue Act of 1962, was allowed for all investments in Section 38 property. Section 38 property was defined to include all "tangible personal property" with certain specific exceptions (for property used to furnish lodging, property used by tax-exempt organizations, property used by governmental units, and property used predominantly outside of the United States). The amount of the credit allowed depended on the useful life of the property for which it was claimed, with the maximum being 7% for qualified property having a useful life of eight years or more. There are three requirements of the investment credit which are at issue in the present appeals. The basic question involved is whether the motion picture and television films and tapes are tangible personal property, with a useful life of eight years or more, and used predominantly within the United States.

### A. LEGISLATIVE HISTORY OF THE INVESTMENT TAX CREDIT

The Report of the Senate Finance Committee on the Tax Reform Act of 1962 did not address the question of whether films and tapes qualify for the credit, but it did say this about what property qualifies for the investment tax credit:

> "Except for the exclusions noted below, *all* tangible personal property qualifies as section 38 property. . . . Tangible personal property is *not* intended to be defined narrowly here, nor to necessarily follow the rules of State law." (emphasis added)

S.Rep. No. 1881, 87th Cong., 2nd Sess., *reprinted in* [1962] U.S.Code Cong. & Admin. News, p. 3318. This broad definition of tangible personal property was consistent with the purpose behind the credit which was to stimulate growth in the economy.

When the investment tax credit was re-enacted in 1971, Congress left the definition of "tangible personal property" unchanged. However, the Senate Finance Committee did address the question of whether the credit should be allowed for motion pictures and television films by expressing its approval of the district court decision in *Walt Disney Productions v. United States*, 327 F.Supp. 189 (C.D.Cal.1971), which allowed the investment credit to be claimed for motion pictures and films:

> "As previously indicated the investment credit is generally available for depreciable tangible personal property. Questions have arisen, however, whether motion picture and television films are tangible (as distinct from intangible) personal property eligible for the credit. A court case decided the question in favor of the taxpayer. The committee agrees with the court that motion picture and TV films are tangible personal property eligible for the investment credit.

> "In determining the amount of credit available with respect to a motion picture or TV film, the committee believes that all costs of production which the taxpayer capitalizes should be taken into account in determining the basis of the film."

S.Rep. No. 92–437, 92d Cong., 1st Sess. 34, *reprinted in* [1971] U.S.Code Cong. and Admin.News, p. 1941.

Finally, the Tax Reform Act of 1976 is relevant to the question presented here. (P.L. 94–455). This Act did not change the definition of section 38 property, but it did refine the manner in which the investment credit was to be applied to movie and television films (P.L. 94–455 § 804). Specific rules for determining predominant use and useful life of films were established. Additionally, taxpayers were allowed to make an election to have their credit determined under compromise provisions established by that section for years prior to 1976 or to continue litigation under the prior law (as the taxpayers are doing in these appeals).

Throughout the legislative history of the investment credit, there is a basic assumption made that motion pictures and television films qualify for the credit.

## B. PRIOR CASE LAW

The question as to whether tapes and film qualify for the investment credit has been previously answered by the courts on three occasions.

In *Walt Disney Productions v. United States,* 480 F.2d 66 (9th Cir. 1973), *cert. denied,* 415 U.S. 934, 94 S.Ct. 1451, 39 L.Ed.2d 493 (*Disney I*), the taxpayer was allowed to take the investment credit on certain of its motion picture negatives. The film in question is simply referred to as "motion picture negatives" with no distinction drawn as to whether they were the films and tapes in step # 1 or step # 2.

Treas. Reg. § 1.48–1(f), which said that a motion picture film or tape was an intangible property and therefore ineligible for the investment credit, was held invalid by the court. The court acknowledged that Treasury regulations must generally be sustained, but in this case the court found that the regulation was inconsistent with the purpose of investment credit statute as shown by the legislative history. Since the question of whether films qualify for the investment credit was not addressed when it was originally established, the court relied on the legislative history of the 1971 Act (as discussed earlier) which reenacted the investment credit and explicitly said that movies and television programs were entitled to the credit.

The court held that the "useful life" of the films for investment credit purposes need not be the same as for depreciation purposes. Additionally, the court found that the basis of the films for investment credit purposes should be the same as it is for depreciation purposes.

*Walt Disney Productions v. United States,* 549 F.2d 576 (9th Cir. 1976) (*Disney III*), contains a much more detailed discussion of the investment credit as it is applied to films. In this case, Walt Disney claimed an investment credit for the costs of producing films, which were not a part of its prior lawsuit. Walt Disney only claimed the investment credit for its master negatives (step # 1), but not for its completion negatives (step # 2) which were used to actually make the exhibition prints. The court found that the "master negatives [were] tangible property within the meaning of 26 U.S.C. § 48(a)(1) (1970) and that the investment tax credit can be claimed for the production costs of such property." 549 F.2d at 580. The court reasoned that:

"The master negatives for each film title are used by Disney as a capital asset to create exhibition prints for rental or sale. Most of the value of the exhibition prints rests on the right of exclusive exploitation protected by copyright, but that fact does not render the capital asset (the master negatives) an intangible. A machine which stamps out patented products for sale is tangible. The character of the acquisition costs of that machine is not affected by the character of the end product, even if the value of the entire system is dependent on the patent, *i. e.,* an intangible."

549 F.2d at 581. The decision goes on to say that the fact that Disney may have treated the property as an intangible for depreciation purposes does not mean that it is an intangible for investment credit purposes.

The government also attempted to argue that since more than 50% of Disney's income from the films resulted from foreign

exhibition, that the credit should be disallowed because this meant that the films were predominantly used outside of the United States within the meaning of 26 U.S.C. § 48(a)(2)(A) (1970). The court, however, dismissed this argument by following Treas. Reg. § 1.48–1(g)(i) which says that property located outside of the United States during more than 50% of the year is considered predominantly used outside of the United States. Despite the fact that some of the completion negatives were used outside of the country to strike exhibition prints, predominant use remained in the United States since the master negatives were kept for use in the United States. Disney was therefore entitled to the credit.

Aside from the *Walt Disney* cases, the only other case which dealt with the issue of whether tapes and film were tangible property was *Texas Instruments, Inc. v. United States,* 551 F.2d 599 (5th Cir. 1977). The taxpayer there introduced sound into the ground and then captured the vibrations from the earth in receivers. These receivers then transmitted the information to stations where it was transcribed onto magnetic computer tapes. After the tapes were edited, a computer would transform the sound information into a visual picture representing a vertical view of the earth's strata. These pictures were sold to customers who used them in exploring for oil and gas. Texas Instruments claimed an investment credit for the costs of producing and processing the tapes and film which were used to make the pictures which it sold. The district court held that taxpayer was making an investment in intangible information, not tangible property and, therefore, was ineligible for the credit. The Fifth Circuit reversed, finding that the films and tapes were tangible property qualifying for the credit, following this court's decisions in the two *Disney* cases.

## C.  GOVERNMENT'S ARGUMENT

The briefs in the Bing Crosby appeal were filed prior to our decision in *Disney III.* The government's general arguments about the investment credit in Bing Crosby were resolved adversely in *Disney III.* However, because of the similarity between the production techniques used by Sussex and Bing Crosby, the government's arguments in the Sussex appeal also apply to Bing Crosby.

The government contends that the Disney rule only allows the taxpayer to claim the credit for the master negatives (step # 1) and not for any of the secondary printing articles as Sussex and Bing Crosby were allowed to do by the district court. By allowing the taxpayers to claim the credit for the secondary articles, every taxpayer will be allowed to allocate the costs to whatever printing article is retained for the longest period of time in order to obtain the maximum credit.

The government challenges the predominant use holding of *Disney III.* Since the district court below considered the exhibition of the prints in determining the useful life of the property, in order to be consistent, it is the exhibition of the prints which should be considered in determining predominant use as well. Therefore, if more income is derived from foreign exhibition, then predominant use would be outside of the United States and the taxpayer would be ineligible for the investment credit.

In MCA, the government suggests that the court apply the provisions of the 1976 Tax Reform Act relating to television and motion picture films retroactively. Under this approach all of the elements of a movie or television program would be considered section 38 property rather than certain designated printing articles. Generally, the useful life is determined by the period of broadcast or exhibition. And predominant use is determined by the place of broadcast or exhibition, rather than where the printing articles are stored or used.

In MCA, the government's final argument focuses on the predominant use requirement, which it argues should not depend upon where the printing articles are kept. The brief's first contention on this point is that predominant use should depend on the source of income, which approach was adopted by the Tax Reform Act of

1976. The government next argues alternatively that predominant use should be determined by the manufacturing role of the asset. Therefore, this case should be remanded for a determination by the district court as to whether the particular negatives were used for manufacturing purposes, primarily in the United States or abroad.

## D. CONCLUSION

■ There is no rational reason why a distinction should be drawn between the printing articles in step # 1 or step # 2, and a taxpayer's entitlement to the investment credit. It would frustrate the statutory purpose of the investment credit which was found in the *Disney* cases to cover the motion picture and television industry, to arbitrarily attribute the production costs to only the master negatives (step # 1), and not allow the credit for the intermediate printing articles (step # 2). The statement in *Disney III* saying that the master negatives are the appropriate property for investment credit purposes should be read, in the context of that case where that was all that was claimed by the taxpayer. Slight differences in production techniques do not justify the uneven tax treatment which is sought by the government.

■ Similarly, there is no reason why this court should depart from its holding in *Disney III* as to the predominant use of television and motion picture films. As long as the property was located within the United States for fifty percent of the year, then its predominant use is considered to be within the United States. [*Disney III*, 549

F.2d at 582, following Treas.Reg. § 1.48–1(g)(i).1] Since it was the clear intention of Congress that the new rules on predominant use of films in the 1976 Tax Reform Act not be applied to prior years, we decline the government's suggestion that we follow a statutory approach as to predominant use (or useful life) under that law. S.Rep. No. 94–938, 94th Cong., 2d Sess., 4 U.S.Code Cong. & Admin.News (1976), p. 3625, fn. 8.

## E. OTHER ISSUES

■ In Bing Crosby, the government contends that the taxpayer was ineligible for the investment credit for the Hogan's Heroes series because CBS was the beneficial owner of that program. As Bing Crosby pointed out in its brief, there are more than enough indicia of ownership to show that Bing Crosby was the beneficial owner of Hogan's Heroes.[1]

The government also claims that summary judgment was improperly granted in regard to the Bing Crosby Show. We find that the district court was correct in concluding that there was no disputed issue of fact and so summary judgment on this issue was proper.

The judgments of the district courts in these three cases are AFFIRMED.

1. "Not only has the Government consistently treated BCP as having a tax basis and equitable interest, it is also clear that BCP has consistently regarded itself, and that others have regarded it, as having an equitable ownership interest in these Negative Elements. Thus, for example, the *Hogan's Heroes* contract with CBS so provides . . . and BCP insured the elements in its name. . . . BCP stored the Negative Elements in its own vaults or at storage companies, laboratories, etc. in its name, paying storage charges where required. . . . BCP obtained copyrights in its name. . . . BCP carried its investment in the Negative Elements on its financial books and records and certified financial statements at cost less depreciation. . . . BCP and others having temporary custody (including networks) reported the Negative Elements as owned by BCP on Los Angeles County personal property tax returns. . . . BCP assumed all liability for, and paid all costs involved in, the production of the Negative Elements and assumed all risk of loss with respect to their production.

Bing Crosby brief at 34–35.