JOHN M. ABRAMSON AND ESTATE OF ILANA ABRAMSON, DECEASED, JOHN M. ABRAMSON, PERSONAL REPRESENTATIVE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Abramson v. Commissioner
Docket Nos. 33419-83, 42511-84.
United States Tax Court
T.C. Memo 1987-276; 1987 Tax Ct. Memo LEXIS 276; 53 T.C.M. (CCH) 985; T.C.M. (RIA) 87276; June 4, 1987. John M. Abramson, pro se. Claudine Ryce and Gary F. Walker, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined deficiencies in petitioner's Federal income tax in the following amounts for the following years: Year
Amount
1974
$51,044
1975
113,848
1976
32,265
1977
12,223
1978
[1] 44,161
1979
2,936
1980
3,617
The issues presented are whether petitioner [2] should be allowed distributive losses and credits attributable to four investments, Essex Associates, Cambridge Associates, Ltd., Berkeley Group, Ltd. and Commonwealth Trading. For convenience, we separately consider each. *278 GENERAL FINDINGS OF FACT The stipulated facts are so found and the stipulation is incorporated herein by this reference. Petitioners resided in Miami, Fla., at the time of the filings of the petitions herein. Petitioner is an attorney practicing law in Miami. ESSEX ASSOCIATES FINDINGS OF FACT During 1974, petitioner began looking for investments and his law school classmate, Michael D. Bodne, introduced him to Essex Associates ("Essex"), a purported equipment leasing investment. On or about June 28, 1974, petitioner and his law partner, Donald Feldman, invested $41,320 to become limited partners in Essex. Respondent has disallowed all of petitioners' claimed losses derived from Essex Associates. [3]
OPINION Petitioner has the burden of proving respondent's determination is incorrect. Rule 142(a). He must show he entered into a transaction that had economic substance or *279 business purpose. See Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 209 (1983), affd. on this issue 752 F.2d 89, 91-92 (4th Cir. 1985). He has failed to do so. Respondent timely objected on authenticity, hearsay and various other grounds to much of petitioner's documentary evidence on the Essex issue. Petitioner did not provide respondent with this evidence until the day of trial. [4]
None of the authors of any of the proffered documents was called as a witness. Only petitioner's testimony linked any of the documents to the actual operation of the investment. Petitioner, however, had no firsthand knowledge of how Essex operated. His hearsay testimony therefore is insufficient to authenticate any of the documents. The documents have not otherwise been authenticated. Therefore, they are not admissible. [5]
*280 Since we cannot consider the transaction documents and petitioner had no direct knowledge of the operations of Essex, there is no way we can determine the contours of the transaction into which petitioner entered. We thus cannot determine whether there was any reasonable opportunity for economic profit therefrom. Therefore, unless petitioner can show some subjective business purpose, he cannot prevail here. See Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 209 (1983), affd. on this issue 752 F.2d 89, 91-92 (4th Cir. 1985). Petitioner sought to establish the bona fides of his Essex investment by stating that he reviewed the proffered documents at or about the time of the investment. [6] Petitioner did not offer any evidence of the Essex general partner's subjective intentions. *281 Therefore, even if we were to admit all of petitioner's proffered evidence for the limited purpose of determining profit motive, it would at best show that petitioner thought he could earn a profit from his investments. Petitioner's profit motive as a limited partner, however, is not determinative. Where investment activities are carried on by a limited partnership, the activities of the general partners determine whether the partners have engaged in an activity for profit. See Fox v. Commissioner,80 T.C. 972, 1008 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Zemel v. Commissioner,Rosenblatt v. Commissioner,Krasta v. Commissioner,Leffel v. Commissioner,Hook v. Commissioner,734 F.2d 5-9 (3d Cir. 1984). Petitioner has offered insufficient evidence from which we could deduce the profit motive of the general partners here. He has failed to carry his burden on this *282 issue. We hold for respondent. During the Essex portion of the trial respondent moved for damages under section 6673. Although petitioner was unable to have much of his evidence admitted, we cannot say, after considering the entire record, that he sought review of his Essex activities primarily for delay or that his position with respect thereto was frivolous or groundless. Thus, we deny respondent's motion for section 6673 damages. [7]
Respondent also raised at trial the issue of the increased interest rate [8] under section 6621(c)[9] with respect to the Essex investment. His theories are that the Essex investment generated deductions which were in effect disallowed by reason of section 465(a), disallowed because they distort income, disallowed pursuant to section 183 and disallowed because attributable to a valuation overstatement within the meaning of section 6659(c)(1). These theories were presented in only the most summary fashion on brief. *283 Respondent has the burden of proof with respect to the issues first raised by amendment to answer. Rule 142(a). Respondent, however, has been arguing throughout these proceedings that we do not have enough evidence with which to judge the merits of the Essex investment. We have agreed with him. We cannot determine whether any of the theories presented by respondent with respect to the section 6621(c) issue should be approved. We decline to award increased interest under section 6621(c). CAMBRIDGE ASSOCIATES, LTD. FINDINGS OF FACT In late 1974, petitioner met Lea J. Marks and her husband Harold Marks. Mrs. Marks was the general partner of Cambridge Associates, Ltd. ("Cambridge"), a Florida Limited partnership formed to deal in motion pictures. Mr. Marks was Cambridge's first limited partner. Petitioner was impressed with Mrs. Marks' expertise in the foreign film industry and Mr. Marks' knowledge of finance. Petitioner considered investing in certain films through Mrs. Marks after he learned that Mrs. Marks was favorably impressed with cuts she had seen of them, and had engaged a law firm petitioner thought to be highly qualified to write the tax opinion for the investment. *284 On November 11, 1974, petitioner and Donald Feldman formed as equal partners a partnership to conduct "a movie investment business." Total initial capitalization was to be $33,750. Also on November 11, 1974, the Abramson-Feldman partnership applied to purchase one unit of Cambridge. The price was set at $18,300 cash and $15,450 to be paid January 15, 1975. To evidence the $15,450 obligation, a noninterest-bearing note was signed by the Abramson-Feldman partnership contemporaneously with the purchase application. Petitioners claimed a Cambridge investment tax credit of $4,124 in 1974, and Cambridge losses of $27,460 in 1974, $43,851 in 1975, $351 in 1976, $375 in 1977, $269 in 1978, $296 in 1979, and $205 in 1980. OPINION Petitioner testified that Cambridge owned certain distribution rights to the film "Dirty Money," a dubbed French film for which Cambridge had paid several hundred thousand dollars in cash and signed a $3.2 million note. No competent corroborative evidence was admitted to establish such ownership, however. Petitioner offered into evidence scattered pages, none of which were signed, of a purchase agreement purporting to evidence the acquisition by Cambridge *285 of Dirty Money. The authentication and hearsay problems preventing this document from being considered by us are obvious. Without firsthand knowledge, petitioner's testimony is also insufficient to establish Cambridge's ownership of the film. Nor do we have any evidence of Cambridge's financial obligations, if any. [10] We therefore have no basis upon which to determine whether or not the Cambridge investment was one of economic substance. [11] Petitioner has not carried his burden of proof as to the Cambridge issue. We uphold respondent's Cambridge deficiency determination. *286 Respondent again seeks increased interest under section 6621(c) with respect to Cambridge. This claim was first asserted by way of Amendment to Answer. As such, respondent bears the burden of establishing entitlement thereto. Rule 142(a). As was the case with the Essex investment, respondent's claim for increased interest must fall for lack of evidence. We simply have too little information with which to judge whether or not the increased interest rate should apply. As the party with the burden of proof, respondent's claim therefore is denied. BERKELEY GROUP, LTD. FINDINGS OF FACT On May 23, 1975, petitioner and Mrs. Abramson applied to Berkeley Group, Ltd. ("Berkeley") to purchase as joint tenants 1-1/2 units of Berkeley for $30,375 in cash and $15,000 due September 15, 1975. [12] Also on May 23, 1975, petitioner and his wife signed a note evidencing their $15,000 obligation. Berkeley is a Florida limited partnership, the initial capitalization of which was to be $607,500. One of the general partners, Mrs. Lea J. Marks, [13] was to contribute *287 $2,500 and sales of 20 limited partnership interests were to generate $605,000. $305,000 of the money was to be used as a "down payment" and to prepay interest on a note for a film, as described below. $302,500 was to be paid either directly to Mrs. Marks or to defray her or the partnership's expenses, or as a sales commission to the corporation of which she was a principal owner and her husband the President. At the time of petitioner's investment, Berkeley represented in its private placement memorandum that it was negotiating the purchase of the United States and Canadian [14] rights to exploit in theaters and on television an Italian film directed by Lina Wertmuller entitled "Caught Up by an Unusual Destiny in the Blue Sea of August" ("Swept Away"). [15] Berkeley represented its purchase price to be $3,385,000 payable $305,000 in cash no later than July 10, 1975 ($154,000 of which was to be allocated to prepaid interest on the note described immediately below) and $3,234,000 by a nonrecourse note to Swept Away's seller, Marbex Finance, Ltd. ("Marbex") of London, England. The note was to be amortized *288 with all of the first $100,000 of "net proceeds" from film distribution and 65 percent of the net proceeds after the first $100,000. The Berkeley private placement memorandum acknowledges that to pay off the principal amount of the partnership note, the film would have to generate $9.4 million of distributor's theatrical gross receipts (i.e., gross receipts from rentals to theater owners). The private placement memorandum represented that 80 percent of theatrical revenues (distinguished from television and "ancillary market" [16] revenues) could be expected to be earned in the first 18 months of distribution. Distributors' fees were 70 percent of theatrical revenues net of expenses, and 50 percent of other rental revenues net of expenses. Distributor's fees were 25 percent of network television receipts and 40 percent of other television receipts, before expenses. Expenses of television distribution were further charges against owners' shares. At one point, petitioner got involved with promoting *289 the movie, apparently dissatisfied with the general partner's distribution efforts. Petitioner and Feldman, at their own expense, put advertisements on the radio when Swept Away played Miami, to increase attendance in that city. Petitioner contends the film was worth what he paid, but was marketed poorly. William Madden is an expert in motion picture marketing. He has been in the business since 1930 when he began work in the sales department of M-G-M. He rose to the position of Corporate Vice President and General Sales Manager, and is a voting member of the Academy of Motion Picture Arts & Sciences. Madden has taught several courses in film marketing over the years at U.C.L.A. Madden valued the theatrical distribution rights which Berkeley purportedly obtained as of 1975 at $85,000. He thought that the gross rentals to theater owners by the distributor would not then be expected to be more than $600,000, [17] and deducted $80,000 for 100 print copies, [18] $20,000 for "start-up" advertising, $150,000 for "co-op" advertising (a plan for and the costs of which are the joint responsibility of the distributor and theater owners), and $180,000 in distribution fees. [19] Madden split *290 the $170,000 remainder in half to allow for reasonable profit on a speculative investment and arrived at a fair market value for theatrical distribution rights of $85,000. We find that expenses would total $390,000, see n. 18, that rentals net of expenses would therefore total $210,000, and that the fair market value of the theatrical distribution rights was $105,000, allowing for reasonable profit on a speculative investment. Fellini's Academy Award winning "Amarcord," one of the top grossing foreign films ever, earned $4 million in domestic theatrical receipts. As of July 28, 1976, Swept Away had been among Variety Magazine's 50 Top Grossing Films for 38 weeks and *291 had earned $3,217,953 in box office receipts to that date. Theatrical receipts are approximately 40 percent of box office receipts. A good distributor can increase by up to 25 percent a film's income over that produced by a lesser distributor. Madden would not have expected to earn a profit on the Berkeley investment as described above. Robert M. Newgard is an expert in television distribution of motion pictures. Newgard has been in the field approximately 35 years, and has worked for Allied Artists, Screen Gems (a subsidiary of Columbia Pictures), Paramount, and Avco Embassy Pictures. Newgard was the head of worldwide distribution at the latter two companies. Newgard concluded that as of 1975, the fair market value of the domestic television rights to Swept Away was $45,000. He doubted the movie could be marketed to a television network because of poor dubbing and somewhat avant-garde subject matter. Public television, however, could be expected to generate revenues of $80,000, cable television another $50,000-$60,000, home video another $20,000-$25,000, and ancillary markets, nominal additional amounts. From this estimated total of $180,000, Newgard would deduct 50 percent *292 for expenses including distribution fees and another 50 percent for reasonable profit on a speculative investment, arriving at a fair market value of $45,000. We find the fair market value of Swept Away's television distribution rights was $45,000. Petitioner claimed a Berkeley investment tax credit in 1975 of $17,057 and Berkeley losses in 1975 of $135,331, in 1976 of $50,195, in 1977 of $10,528, in 1978 of $6,417, in 1979 of $3,671 and in 1980 of $2,896. ULTIMATE FINDING OF FACT The 1975 fair market value of the Swept Away distribution rights at issue here was no more than $150,000. OPINION The Berkeley movie investment presents us with a generic tax shelter susceptible to the analysis set out in Rose v. Commissioner,88 T.C. 386 (1987). [20] Applying such an analysis, it is clear that petitioner has failed to prove his investment should be respected for Federal income tax purposes as one of economic substance. Under Rose, we look to the following factors to evaluate economic substance: *293 (1) The dealings between petitioner and the promoters, (2) the relationship between the sales price and fair market value, (3) the structure of the financing, and (4) perceived Congressional intent. (1) The Dealings Between Petitioner and Lea J. Marks
Twenty percent of the Berkeley private placement memorandum is a "brief summary" of the Berkeley tax opinion, said in the memorandum to be attached thereto, but not offered in evidence. The memorandum acknowledges Berkeley will be viewed as a "tax shelter." Petitioner was told about the investment by a tax lawyer. Although petitioner testified he invested to level out his cyclical income, we conclude, based on the entire record, that petitioner invested in Berkeley primarily, if not exclusively, to reduce the tax on his income. Petitioner did not question certain "appraisals" of anticipated receipts from film rentals which Mrs. Marks provided. These essentially were verbatim reproductions of each other, done in obvious collusion to support an inflated value. They should have raised the suspicions of any reasonable investor. Petitioner sought out no verification or corroboration of any of Mrs. Marks' information. Petitioner *294 testified about how impressed he was with Mrs. Marks' experience and expertise in exploiting foreign films, and with the prospects for Lina Wertmuller, Swept Away's director. However, the record convinces us that petitioner was indifferent to both his prospects for economic profit and the true value of the property. As in Rose v. Commissioner,supra at 416, we must acknowledge some efforts by petitioner to get involved in the film distribution. This evidence, that petitioner put ads on the radio when Swept Away played Miami, and protested about poor distribution efforts by Mrs. Marks and her agents, although some proof that petitioner wanted Swept Away to succeed economically, simply is insufficient to overcome the plethora of evidence that at the time petitioner invested, he cared little about insuring he made economic profit through arm's-length dealing. (2) Relationship Between Sales Price and Fair Market Value
Madden and Newgard presented unrebutted expert testimony about the fair market value of the film at the time of the investment. Although the film performed better at theaters than Madden would have predicted, we will not second-guess his *295 ample expertise with 20-20 hindsight. Except for a 50 percent reduction in Madden's estimation of film print expense, see n. 18, above, we have accepted the experts' opinions of fair market value, and found such value to be no more than $150,000, i.e., $105,000 for the theatrical distribution rights and $45,000 for the domestic television rights. Even accepting the representations in the private placement memorandum for evidence of Berkeley's purchase price, without any direct evidence thereof, [21] it is obvious that Berkeley's alleged purchase price ($3,385,000) bore no relation to the film's fair market value ($150,000). (3) Structure of the Financing
The presence of deferred debt that is in substance or in fact not likely to be paid is an indicium of lack or exaggeration of economic substance. Rose v. Commissioner,supra, at 419. *296 In this case, we have no direct evidence of what debt the partnership was burdened with. See n. 21, supra.Yet, even if we were to rely on petitioner's hearsay testimony and the private placement memorandum regarding the nature of Berkeley's obligation, we could come to no other conclusion than that the debt is unlikely to be paid. The memorandum candidly states that Swept Away's distributor's theatrical gross receipts would have to exceed $9.4 million before the note principal would be paid. There is no evidence in the record that any dubbed foreign-language film has ever brought in more than the $4 million in rentals earned by Fellini's "Amarcord." We think unreasonable any hope as of the time of the investment that Swept Away would do better than it actually did. As of July 28, 1976, Swept Away had been among Variety Magazine's "50 Top Grossing Films" for 38 weeks and had earned $3,217,953 at the box office to that date. Box office gross as reported in Variety, however, would have to be reduced 60 percent to equate with distributor's theatrical gross receipts. Thus, even Swept Away's relatively handsome box office receipts yield distributor's theatrical gross receipts *297 of only $1,287,181 in the 38 weeks of which petitioner has offered evidence. Assuming these were the first 38 weeks of the film's release, [22] and annualizing the actual receipts for these 38 weeks we find that 18 months of distributor's theatrical gross would produce $2,642,110.42. This is far short of the $7,520,000 (80 percent X $9.4 million) which the movie would have to earn to be on schedule for repayment. [23] Thus, even repayment only of the note's principal was a fantasy. Petitioner's attempts to prove that the film did not receive sufficient promotion were unconvincing. But even if we accept them, *298 and add the maximum income increment realizable by replacing a bad distributor with a good one ($2,642,110.42 + 25 percent), receipts still would be only $3,302,638.03, far short of the $7,520,000 needed to be on schedule after 18 months to repay the note principal. Of course these figures ignore interest, which makes repayment an even more remote possibility. (4) Perceived Congressional Intent
We acknowledge that in an appropriate case, a film investment is not per se precluded from generating a depreciation deduction or an investment tax credit. See section 48(k); Brannen v. Commissioner,722 F.2d 695 (11th Cir. 1984); Walt Disney Productions v. United States,549 F.2d 576 (9th Cir. 1976). Merely because a film may in some cases be the proper subject of a credit or deduction, however, begs the question of whether Congress intended to bless the type of transaction at issue here. We have not hesitated to deny depreciation deductions and investment tax credits in film investments. See Tolwinsky v. Commissioner,86 T.C. 1009 (1986). [24]
*299 The appropriate inquiry under this Rose factor is whether there was a Congressional intention to encourage the type of activity, through the granting of tax benefits, in which petitioner engaged, so that he should not be penalized by denial of these benefits. A simple answer to the inquiry here is that petitioner has not sustained his burden of showing the partnership did that which the depreciation and investment credit statutes intended. We hold for respondent on the Berkeley deficiency. In so holding, we emphasize that although Swept Away may have done well compared to other movies of its genre, and even may have made a profit for some people connected with it, the focus must be kept on petitioner and the investment in which he participated. Petitioner's investment had no economic substance. Respondent also seeks the increased interest rate under section 6621(c). This claim was first asserted by way of Amendment to Answer. As such, respondent has the burden of establishing entitlement thereto. Rule 142(a). Respondent has not advocated on brief any theory under which increased interest is available. The only mention of such interest in either of the *300 briefs relating to the Berkeley transaction is a proposed finding of fact that the Berkeley investment generated a substantial underpayment of tax attributable to a tax-motivated transaction. We nevertheless conclude that increased interest is applicable here, under section 6621(c)(3)(A)(i). Section 6621(c) provides that an increased rate of interest shall apply in the case of a substantial underpayment of tax attributable to a tax motivated transaction. A tax motivated transaction includes any valuation overstatement within the meaning of section 6659(c). Section 6621(c)(3)(A)(i). Section 6659(c) provides that there is valuation overstatement if the value of any property claimed on any return is at least 150 percent of the correct value. We have found that the value of the relevant rights to Swept Away at the time bought by Berkeley was no more than $150,000. As a basis for depreciation and the ITC, petitioner claimed the value of those rights was $3,385,000. This figure is greater than 150 percent of $150,000. Petitioner has engaged in a tax motivated transaction with respect to *301 Berkeley. Increased interest is applicable thereto, if the underpayment with respect thereto is "substantial," as defined in section 6621(c)(2). We will enter decision under Rule 155 to allow for this determination. We acknowledge an apparent anomaly, that although we award increased interest here, we declined to award increased interest where petitioner presented less admissible evidence (i.e., with respect to Essex & Cambridge) than he did with respect to Berkeley. Because the issue was raised by amended answer, the burden of proof with respect to increased interest is on respondent. Rule 142(a). With respect to Essex and Cambridge, respondent offered insufficient evidence to show either investment came within the terms of section 6621(c) or the regulations thereunder. Indeed, respondent even declined to stipulate to the authenticity of the private placement memoranda. With respect to Berkeley, respondent affirmatively proved the value of the film rights and showed the investment to be within section 6621(c)(3)(A)(i). COMMONWEALTH TRADING FINDINGS OF FACT Commonwealth Trading ("Commonwealth") was a Cayman Islands general partnership formed at or around the beginning *302 of 1978. An accountant petitioner was friendly with, Robert A. Stone, introduced him to Commonwealth, which petitioner understood to be involved in trading commodities, especially metals in London. Petitioner knew investing with Commonwealth was a high risk proposition, but knew little about how the deal was supposed to make money, if at all. He only vaguely knew concepts to be employed, including margin futures trading and arbitrage, and he thought Commonwealth had the potential to execute transactions while avoiding brokerage fees. On December 27, 1978, petitioner executed a document intending to create a revocable trust, naming Mrs. Abramson trustee and himself income beneficiary. On January 26, 1979, petitioner purported to make the trust irrevocable and remove himself as income beneficiary by an amendment thereto, but omitted designation of the new beneficiary as well as other designations for which blanks were provided in the form trust amendment document he used. There is no evidence that any res was contributed to the trust. [25] Nevertheless, the trust contracted to purchase an interest in Commonwealth. There is no evidence that the trust ever performed on the contract. *303 [26]
Although petitioner cross-examined Roberto Perkins, an original individual general partner of Commonwealth, he did not attempt to authenticate for introduction into evidence through Perkins any of the Commonwealth documents with which he sought to prove his case. [27] A signature that purported to be Perkins' appeared on several of these. Respondent's expert was Dr. William W. Welch. Dr. Welch, who has written numerous *304 books and articles on options and related subjects, received a Ph.D. from the University of Michigan Graduate School of Business, a Master's Degree in Economics from the University of Michigan and a Bachelor's Degree in Economics from Ohio State University. He has taught since 1977 at Florida International University, where he is an Associate Professor and Assistant Director of the International Banking Center. Dr. Welch was a floor trader for 15 months on the Chicago Board Options Exchange. Dr. Welch could not be sure from a review of the proffered documents that any commodities trading had occurred. He further concluded that Commonwealth, if anything, was not a dealer in commodities, but at best a trader. Petitioner offered no countervailing expert evidence. Petitioners *305 claimed distributive losses from the John M. Abramson trust on their 1978 return of $58,854. Opinion Respondent argues that the alleged commodities transaction entered into here is a sham, through which no tax benefits may be derived, citing Knetsch v. United States,364 U.S. 361 (1960). To establish the bona fides of the Commonwealth investment, petitioner has only argued the admissibility of certain documents and the inability of Dr. Welch to state with certainty that the commodity trades never occurred. It is clear that petitioner has the burden to prove entitlement to his claimed losses. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). And although it is equally clear that we may accept or reject expert testimony as we see fit, Chiu v. Commissioner,84 T.C. 722, 734 (1985), where, as here, a clearly qualified expert presents unrebutted testimony which casts doubt on the reality of the transaction at issue, petitioner cannot prove his case merely by relying on the fact that the expert may not have been 100 percent positive. *306 Therefore, we are left with only petitioner's reliance on the proffered documents to prove the commodities trades actually occurred, and yielded losses in a transaction we should recognize for Federal tax purposes. Petitioner's case must fail, however, for we sustain respondent's objections to the documents. [28]
The documents offered suffer from authentication problems similar to those noted with respect to the Essex issue. Moreover, they are hearsay when used to prove the details of the Essex investment's operation. Petitioner has conceded that he had no expertise or control over any Commonwealth transactions. Any knowledge of its activities was certainly hearsay. Any records of its activities could not therefore be authenticated by petitioner. Although petitioner examined Roberto Perkins, one of the Commonwealth original general partners whose name appears on several of the proffered documents, petitioner did not attempt to authenticate his evidence through that witness. We realize that Perkins may not have been as helpful to petitioner as some of the *307 other Commonwealth participants may have been, but petitioner did not call any other Commonwealth participants. We have long recognized that it is proper to draw an adverse inference from a party's failure to produce evidence that is available to them. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Such an inference, that those with the knowledge to authenticate the documents could not withstand a searching cross-examination, here further supports our conclusion that the proffered evidence is inadmissible. We sustain respondent's determination with respect to the Commonwealth deficiency. Respondent also seeks an increased interest rate under section 6621(c). This claim was first asserted by way of Amendment to Answer. Thus, respondent has the burden of establishing entitlement thereto. Rule 142(a). As with the Essex and Cambridge Investments, respondent's claim for increased interest must fall as a result of the inadequate evidence. We simply cannot judge whether or not the Commonwealth *308 investment represented a tax motivated transaction within the meaning of section 6621(c)(3). As the party with the burden of proof, respondent's claim therefore is denied. To allow for the possibility of an increased interest rate if the underpayments attributable to the Berkeley investment are substantial, Decisions will be entered under Rule 155.
Footnotes
1. The 1978 deficiency is at issue in docket No. 33419-83. The balance of the deficiencies are at issue in docket No. 42511-84. By order of March 11, 1985, this Court consolidated the two dockets for trial, briefing, and opinion.↩
2. After the petitions were filed, Ilana Abramson died and her estate, John M. Abramson, Personal Representative, was substituted as party in each docket. For convenience, we refer to John M. Abramson as petitioner.↩
3. Petitioners claimed Essex losses as follows: Year
Amount
1974
$4,587
1975
9,725
1976
11,018
1977
803
1978
5,230
1980
3,508
They reported Essex income in 1979 of $3,850.↩
4. We admitted and considered those five documents which petitioner did give respondent prior to trial. Insofar as they are relevant, we have found above the facts they support.↩
5. In his reply brief, petitioner has directed us to a number of cases without stating which arguments they support. In fact, they support none. If not affirmatively damaging to his case, they are either irrelevant or readily distinguishable. We do not here exclude evidence under the best evidence rule or because of any chain of custody problems. Nor has petitioner relied on Fed. R. Evid. 702 or 1006↩. We need not reach the applicability of the naked hearsay exceptions on which he does rely because of our ruling on authenticity.
6. All the documents, however, are dated significantly later than June 28, 1974, the date of petitioner's investment, except: (1) a tax opinion letter (the tax opinion letter is dated June, 1974, with the day of the month left blank), (2) an unexecuted amendment to agreement of limited partnership, (3) a private placement memorandum describing Essex as a Connecticut limited partnership involved in the purchase and leaseback of computer and office equipment, and (4) a packet of schedules including details of leases, Essex investor benefits, SEC filings for Weston International Corp., ("Weston"), financial statements for Curtis Equipment Corp., ("Curtis") and appraisals for the Essex equipment allegedly under lease.↩
7. We might also deem this issue conceded, inasmuch as respondent has not addressed it on brief.↩
8. Respondent states on brief the issue was raised by an Amendment to Answer filed at trial. The documents filed at trial, however, appear to relate solely to the other three investments at issue in this case. We assume for respondent's benefit that the documents are not so restricted, and that the issue was raised with respect to the Essex investment by a duly filed Amendment to Answer. ↩
9. Subsec. (d) of sec. 6621↩ was redesignated subsec. (c) and amended by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(c)(1)(A)-(C), 100 Stat. 2744. We use the reference to the Internal Revenue Code as redesignated and amended.
10. Petitioner did not offer into evidence a note or private placement memorandum for Cambridge. ↩
11. Petitioner has argued that he changed his status from that of limited partner to that of general partner, apparently in an effort to shift our focus to him for the profit motive inquiry. His isolated distribution efforts, however, were undertaken more with respect to his Berkeley investment, discussed below. Even considering petitioner's proof of his efforts on behalf of Dirty Money, we conclude those efforts, if any, clearly do not render petitioner the party that is in control of the partnership affairs and whose expertise is relied on in making partnership decisions. See Fox v. Commissioner,80 T.C. 972, 1008 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Zemel v. Commissioner,Rosenblatt v. Commissioner,Krasta v. Commissioner,Leffel v. Commissioner,Hook v. Commissioner,734 F.2d 5↩-9 (3d Cir. 1984).
12. Like the Essex investment, Berkeley was brought to petitioner's attention through Michel D. Bodne. Bodne was a tax lawyer.↩
13. Mrs. Marks' son, Jonathan Jay Marks, was the other general partner.↩
14. French speaking Canada was excluded. ↩
15. The name was later changed to "Swept Away."↩
16. These include airlines, mining camps, armed forces bases, and the like.↩
17. 300 bookings were estimated, at an average rental of $2,000 for each. ↩
18. Madden stated that since prints usually came in lots of 50, he would have bought 100. He later conceded, however, that 50 might have been sufficient. We find that 50 prints would have been an appropriate purchase. ↩
19. Apparently, Madden disregarded the distributorship arrangement described above. Without admissible direct evidence of that arrangement, and because Madden's approach seems more favorable to petitioner, so do we.↩
20. See Gilbert v. Commissioner,T.C. Memo. 1987-165↩.
21. Petitioner offered a note in evidence purporting to obligate Berkeley to Marbex in the amount of $3,234,000 plus six percent simple interest. The note is unsigned and we sustain respondent's authenticity objection to its admission. Cf. Fed. R. Evid. 902(9)↩.
22. We do this so we may utilize the statement in the private placement memorandum which we will assume accurate for these purposes, that 80 percent of the film's theatrical revenues could be expected in the first 18 months of its release. ↩
23. Although the record does not reveal what the promoters thought the necessary television revenues would have to be before the note was paid off, the above analysis of theatrical receipts leads us to conclude that reasonably foreseeable television and ancillary revenues would also fall far short of those required to show a profit.↩
24. See also Gilbert v. Commissioner,T.C. Memo. 1987-165↩.
25. The res was said in the trust to be described in Schedule A to the trust, but no Schedule A was submitted to the Court. Submitted as part of the same exhibit as the trust, however, was a subscription agreement by which the trust itself offered to purchase and Commonwealth agreed to sell a unit of Commonwealth for $10,000. ↩
26. Petitioner offered into evidence a $10,000 negotiated check drawn to his order, and endorsed by him. Below petitioner's endorsement is a special endorsement in a hand other than petitioner's that reads "For deposit only COMMONWEALTH TRADING 02 1576." Whether or not we accept this as establishing that petitioner bought for $10,000 an interest in Commonwealth Trading, is irrelevant to our holding, so we make no finding on the matter.↩
27. Petitioner may have been aware that Perkins would not be of much help to him, as evidenced by the following colloquy: Q I don't need to remind you that you are under oath and subject to penalties for perjury, so I just want to ask this last question. Was Commonwealth created to engage in commodity trading to make a profit or to manufacture commodity losses for the participants? A I don't remember.↩
28. We thus avoid deciding questions involving the trust such as whether it was validly created under state law.↩