DAVID J. MORRISSEY AND MARIA MORRISSEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Morrissey v. Commissioner
Docket No. 21483-87
United States Tax Court
T.C. Memo 1989-646; 1989 Tax Ct. Memo LEXIS 647; 58 T.C.M. (CCH) 859; T.C.M. (RIA) 89646; December 7, 1989
David J. Morrissey and Maria Morrissey, pro se. Craig A. Etter, for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined a deficiency in petitioners' Federal income taxes for taxable year 1983 in the amount of $ 16,500 and an addition to tax in the amount of $ 4,125 pursuant to section 6661. [1] Respondent also determined that increased interest was due from petitioners pursuant to section 6621(c) (formerly section 6621(d)). By amended answer, respondent asserts that petitioners are liable for the additions to tax under sections 6653(a)(1) and (a)(2) and 6659 for taxable year 1983. After concessions, the issues for decision are whether a certain master recording lease entered into by petitioners lacked economic substance and should be disregarded for tax purposes and whether petitioners are liable for additions to tax or increased interest pursuant *649 to any one or more of sections 6661, 6653(a)(1) and (a)(2), 6659, and 6621(c). FINDINGS OF FACT Certain facts are stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioners resided in Washington, D.C., when they filed their petition in the instant case. Petitioner David J. Morrissey has a degree in electrical and electronics engineering. His wife, petitioner Maria Morrissey, is a graduate in piano performance from the Conservatorio Nacional of Havana, Cuba. During taxable year 1983, petitioner David J. Morrissey was 65 years old and was employed as a senior executive with the Federal Aviation Administration, earning a salary of $ 60,024. Petitioner Maria Morrissey earned $ 1,430 during taxable year 1983 from Georgetown University. Petitioner David J. Morrissey (hereinafter referred to individually as "petitioner"), executed a Master Recording Equipment Lease agreement (the "lease") for the lease *650 of a master recording from American Marketing Company. On December 29, 1983, pursuant to the lease, petitioner paid $ 6,000 to American Marketing Company as "prepaid rental" for the master recording. The lease provided for additional rental of fifty percent of any gross revenue earned on the master recording. The term of the lease was eight years. The master recording leased was entitled "The Bremen Town Musicians" and was a children's recording (hereinafter referred to as the "master recording"). Petitioner was given a copy of a document purporting to be a promissory note whereby American Marketing Company agreed to pay International Educational Recordings the sum of $ 125,000 for the worldwide distribution rights for the master recording. The principal of the note plus interest was to be paid on or before December 30, 1995. The investment in the leasing program was sold to petitioner by Thomas J. Clovis, of T.C.I. Tax and Financial Planning, a broker affiliate of American Marketing Company during 1983 and 1984. When Mr. Clovis sold the leasing program to petitioner, he stressed the income potential and the immediate tax advantage of the program. Petitioner chose a distributor *651 for the master recording from a list provided by Mr. Clovis. The distributor chosen by petitioner was Troubador Recording and Distributing Corporation ("Troubador"). Petitioner executed a Service Agreement with Troubador (the "first service agreement") for the distribution of the master recording leased from American Marketing Company. Pursuant to the first service agreement, petitioner paid $ 1,795 to Troubador. On their 1983 Federal income tax return, petitioners claimed that they were entitled to an investment credit of $ 12,500 based upon the "pass through" by American Marketing Company of an investment in property having a value of $ 125,000. Petitioners, however, claimed an investment credit of only $ 8,145 in 1983 because of the limits placed on the amount of investment credit that could be used against their 1983 income tax liability. Petitioners carried forward $ 3,397 of the unused investment credit to taxable year 1984 and the remainder of the unused investment credit was carried back to taxable years prior to 1983. In their brief, petitioners have conceded their entitlement to the investment credit. On Schedule C of their 1983 return, petitioners claimed a deduction *652 for the $ 6,000 paid to American Marketing Company pursuant to the lease and a deduction for $ 720 of the fees paid to Troubador under the first service agreement. The first service agreement was terminated by Troubador on August 7, 1984, because the master recording was not delivered to Troubador within the 90 day period required by the first service agreement. In October 1984, petitioner entered into an agreement (the "second service agreement") with Album Globe Distribution Co., Inc. ("Album Globe") providing for the distribution of the master recording. On October 25, 1984, pursuant to the second service agreement, petitioner paid $ 1,750 to Album Globe. On Schedule C of their 1984 Federal income tax return, petitioners claimed a deduction in the amount of $ 1,750 for the distribution fees paid to Album Globe Distribution Co., Inc. The master recording was first received by petitioner on September 12, 1984. Petitioners neither listened to the master recording before leasing it from American Marketing Company nor obtained any written appraisals or written valuations of the master recording. Petitioners are not aware of any sales of any recordings made from the master *653 recording. Petitioners have not received any income from sales of recordings or copies of the master recording. Petitioners did not claim any income from such sales on their 1983, 1984, 1985, or 1986 returns. Prior to the lease of the master recording, petitioners had no formal training in or experience with the marketing or distribution of records. OPINION With the exception of the additions to tax asserted in respondent's amended answer, petitioners bear the burden of proving that respondent's determinations are incorrect. Rule 142(a). The parties have argued the instant case within the analytic framework set forth in Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989). We will evaluate their respective positions accordingly. Generic Tax Shelter
In Rose, we set forth a unified approach for determining whether "generic tax shelters" have economic substance. Preliminarily, petitioners contend that the master recording lease transaction involved in the instant case is not a generic tax shelter. In Rose, we defined a generic tax shelter as having some of or all of the following characteristics: (1) *654 Tax benefits are the focus of the materials used to promote the program; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract, and substantially overvalued in relation to the tangible property involved as part of the package; (4) the tangible assets were acquired or created at relatively small costs shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance. * * * Rose v. Commissioner, supra at 412. Petitioners argue that the promotional materials had a balanced content between presentation of profit potential and tax benefits. We do not agree. While the promotional materials did contain other descriptive matter, the materials were clearly focused on tax benefits. Most of the 16 pages comprising the promotional materials contain a discussion of tax benefits and many of the pages are devoted entirely to the discussion of tax benefits. To show that their master recording leasing transaction was not a generic tax shelter, petitioners *655 next argue that they negotiated a reduction in the "price of the lease" from $ 7,000 to $ 6,000. Yet, all of the other terms of the program were preprinted on forms and were accepted by petitioner without any negotiation. They also accepted, without negotiation, the amount of the fee to be paid to Troubador under the first service agreement. We also note that petitioners failed to call Mr. Clovis as a witness to testify about their negotiations and corroborate petitioners' claim that the price reduction was a result of their negotiations. Under the circumstances of the instant case, the fact that the prepaid rental fee was reduced from $ 7,000 to $ 6,000 does not convince us that petitioner's investment in the master recording was not a generic tax shelter as that term is used in Rose. Petitioners further argue that the asset in question is the lease, rather than the master recording, and that the lease was not difficult to value. They contend that the lease is worth at least the $ 6,000 they paid in advance rentals because respondent's expert estimated that the cost of duplicating the master recording would be between $ 4,000 and $ 5,000. Respondent's expert, however, valued *656 the lease rights to the master recording at $ 500. Petitioners failed to offer any evidence other than their own self-serving testimony that they could have sold a sufficient number of recordings at a sufficient price per copy to be profitable. We think it is obvious that the package of purported rights in the master recording granted to petitioners under the lease was difficult to value. The master recording was apparently created shortly prior to the time it was purportedly purchased by American Marketing Company. Petitioners have not shown otherwise. Nor have they shown that the master recording was created at a cost consonant with the $ 125,000 purchase price purportedly paid by American Marketing Company. The bulk of the $ 125,000 consideration purportedly paid by American Marketing Company to International Educational Recordings was deferred, and petitioners have not shown that such consideration was recourse. The copy of the note between American Marketing Company and International Educational Recordings offered by petitioners was not authenticated at trial and, while the note is nominally entitled "Full Recourse," petitioners have not offered any evidence of its execution *657 or of the circumstances under which it was made. For that matter, we do not even know if the note was delivered. Furthermore, it is clear that petitioners had no liability under the lease beyond the income from the master recording. In light of the foregoing circumstances, we find that the transaction involved in the instant case is a generic tax shelter as that term is used in Rose. Economic Substance
We turn next to the issue of whether the transaction involving the lease of the master recording lacks economic substance. If we conclude that the transaction is devoid of economic substance, it will be disregarded for Federal income tax purposes. Under the approach of Rose, the objective factors to be analyzed are petitioners' dealings and investment activities, the relationship between fair market value and price, the structure of the financing, and perceived Congressional intent. Rose v. Commissioner, 88 T.C. at 415-422.
1. Petitioners' Dealings and Investment Activities
Petitioners have not shown that their investment in the master recording lease was approached in a businesslike manner. Prior to leasing the master recording, *658 petitioners had no formal training in or experience with the marketing or distribution of recordings. Lacking in such experience, had petitioners been interested in profit, we think they would have contacted an independent expert for the purpose of studying the economic viability of the proposed investment, i.e., the potential cash flow. Rybak v. Commissioner, 91 T.C. 524, 537 (1988); Soriano v. Commissioner, 90 T.C. 44, 57 (1988); Rose v. Commissioner, supra at 415-416. Petitioners claim to have made some inquiries about the value of the master recording, although petitioners' testimony did not disclose to whom those inquiries were addressed. Petitioner testified that no one would give him "an opinion or estimate," because children do not care about the identity of the artist but only "want to hear their nursery rhymes or fables." Petitioners claim that their investigation gave them a favorable impression of the market and of the product's viability. We find petitioners' statements about their inquiries unconvincing. We believe that such statements further evince the thinness of their claim that they were motivated by *659 profit. Our conclusion is supported by the fact that the specific master recording to be leased by petitioners was not known until after the lease and the first service agreement were entered into. Petitioners have not convinced us that they made any serious effort to project sales or costs prior to entering into the proposed investment. Petitioners presented no evidence of either the number of recordings produced from the master recording or the number of copies sold, and they reported no income from the sales of copies of the master recording. Petitioners argue that they relied on a pre-investment analysis undertaken by Mr. Clovis of T.C.I. Tax and Financial Planning. That analysis, however, appears to have been undertaken to show the anticipated tax benefits based upon petitioners' cash investment and differing levels of sales. There was no projection of the potential market for the master recording in Mr. Clovis' analysis. Based upon the foregoing, we find that petitioners have not shown that their investment activities comported with those that would evince an actual and honest profit objective. Rose v. Commissioner, supra at 416-417. 2. *660 Relationship Between Fair Market Value and Price
At first blush it would seem that an analysis of the value of the master recording itself would have little relevance for two reasons: first, petitioners have conceded their entitlement to the investment credit; and, second, we have stated that the fair market value of the asset being leased is not a good indicator of the feasibility of the project. Soriano v. Commissioner, supra at 54. [2] We think, however, that petitioners' failure to substantiate the value of the master recording reveals the true nature of their investment, namely, that it was one without economic substance. Rybak v. Commissioner, 91 T.C. at 538-540. At trial, respondent offered an expert's opinion of the value of both the master recording and the lease rights to the master recording. Respondent's *661 expert examined the master recording's market potential. He noted that the children's recording industry is extremely competitive and that recordings such as the Bremen Town Musicians are not readily in demand and must be marketed by a company that has the necessary experience and leverage to achieve maximum sales potential for the recordings. He testified that the cost to produce, package, and distribute the records made the venture uneconomical. Respondent's expert testified that the subject matter of the master recording was not unique. In addition, the master recording did not have name recognition or any other attribute which would encourage retailers to stock recordings and consumers to buy them. He stated that anyone interested in acquiring a product such as the master recording could acquire it for a price of $ 1,000, and that it might cost $ 5,000 to $ 6,000 to duplicate it. Respondent's expert concluded that the fair market value of the "lease rights" to the master recording "would not exceed $ 500" and that the fair market value of the "purchase right" to the master recording "would not exceed $ 1,000." Petitioners have not shown any good reason for us to doubt *662 the accuracy of the appraisal by respondent's expert. Petitioners did not offer any expert opinion regarding the fair market value of either the master recording or the rights acquired pursuant to the lease, and they did not present any expert testimony concerning the market potential for the master recording, i.e., the number of recordings that could be sold and the price at which they could be sold. Petitioners therefore have failed to prove that sales of copies of the master recording would produce sufficient cash flow to make the lease a profitable venture. Soriano v. Commissioner, 90 T.C. at 57. We find the value of the rights petitioners acquired in the master recording pursuant to the lease to be $ 500 and the value of the master recording to be $ 1,000. Accordingly, the fair market value of petitioners' lease rights bears no relationship to the $ 6,000 paid as advance rentals under the lease. 3. Structure of the Financing
Deferred debt that is in substance or in fact not likely to be paid lacks economic substance. Knetsch v. United States, 364 U.S. 361 (1960); Rose v. Commissioner, 88 T.C. at 419; Waddell v. Commissioner, 86 T.C. 848 (1986), *663 affd. 841 F.2d 264 (9th Cir. 1988); Estate of Baron v. Commissioner, 83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986). The substance, not the form, of such debt is examined. Waddell v. Commissioner, supra.
Although no notes were signed by petitioners, the investment credit claimed by petitioners was based on the inflated purchase price purportedly paid by American Marketing Company to International Educational Recordings. American Marketing Company purportedly elected to "pass through" that investment credit to petitioners pursuant to section 48(d). The price purportedly paid by American Marketing Company, however, was represented entirely by a long-term note. As noted above, the note was not authenticated at trial, and petitioners presented no evidence of the circumstances surrounding its execution or delivery, if in fact it was delivered. Moreover, we note that the structure of the transaction as a lease calling for rent payable solely out of the income from sales is comparable to nonrecourse financing, Soriano v. Commissioner, 90 T.C. at 57, 59-60, and petitioners have failed to prove any *664 likelihood that any sales of records would be made. Accordingly, petitioners have failed to prove that the purported purchase price upon which they claimed their investment credit would be paid. 4. Perceived Congressional Intent
Petitioners cite the opinions of the Ninth Circuit, discussed in Ronnen v. Commissioner, 90 T.C. 74, 97 (1988), as evidence of Congress' intent regarding master sound recordings. Those cases, EMI North America Holdings, Inc. v. United States, 675 F.2d 1068 (9th Cir. 1982); Bing Crosby Productions, Inc. v. United States, 588 F.2d 1293 (9th Cir. 1979); Walt Disney Productions v. United States, 549 F.2d 576 (9th Cir. 1976); and Walt Disney Productions v. United States, 480 F.2d 66 (9th Cir. 1973), discuss whether certain property is tangible personal property for the purpose of satisfying investment credit restrictions. They, however, are not proof of Congress' intent. To the contrary, we do not think Congress intended to foster investment in the activity involved in the instant case. See Rose v. Commissioner, supra at 421-422. Petitioners *665 have failed to advance any legislative history showing that Congress intended to foster such activity, and we are aware of none. We have considered petitioners' remaining arguments and find them without merit. Petitioners have failed to show that their master recording leasing activity has economic substance and should not be disregarded for Federal income tax purposes. Rose v. Commissioner, supra. Accordingly, petitioners are not entitled to claim deductions or investment credit relating to the transaction. The deduction disallowance extends to the cash payments, including advance rentals under the lease. Such payments merely represent a fee for the purchase of tax benefits and, consequently, may not be deducted. Patin v. Commissioner, 88 T.C. 1086, 1125 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gromberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). The disallowance *666 also extends to the distribution fees to Troubador and Album Globe. Additions to Tax Under Sections 6653(a)(1) and (a)(2)
Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) provides for an addition to tax in an amount equal to 50 percent of the interest on the portion of the underpayment attributable to negligence. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Because the negligence additions were pleaded in his amended answer, respondent bears the burden of proving that petitioners lacked due care or failed to do what a reasonable and ordinarily prudent person would do under the circumstances. Rule 142(a). There is no objective support for the value of the master recording upon which petitioners claimed deductions and investment credit. Furthermore, petitioners stipulated that the master recording was not received until September 12, 1984. Petitioners' *667 actions were not those which reasonable and ordinarily prudent persons would have taken under the circumstances. We do not find petitioners' purported reliance on Mr. Clovis to be reasonable under the circumstances, as Mr. Clovis was the individual who sold the investment to petitioners. Mr. Clovis' lack of independence and objectivity should have been obvious to petitioners. Accordingly, we find that the deficiency resulting from the lease of the market recording is due to negligence and intentional disregard of rules and regulations. Petitioners therefore are liable for the additions to tax under sections 6653(a)(1) and (a)(2). Additions to Tax Under Section 6659
Section 6659 imposes a graduated addition to tax when an individual has an underpayment of tax which equals or exceeds $ 1,000 and is attributable to a valuation overstatement. Section 6659(c) provides that a valuation overstatement occurs "if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)." If the claimed valuation exceeds 250 percent *668 of the correct value, then the addition is equal to 30 percent of the underpayment, but only to the extent attributable to the valuation overstatement. Because the section 6659 addition to tax was pleaded in his amended answer, respondent bears the burden of proof. Rule 142(a). Section 6659 does not apply to underpayments of tax which are not "attributable to" valuation overstatements. See Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988). As noted above, on brief, petitioners invite us to accept their concession that the master recording was not placed in service during taxable year 1983. If accepted, such a concession would result in the disallowance of the claimed investment tax credit, not because the master recording was overvalued, but because it was not placed in service in the year claimed. Todd v. Commissioner, supra.
We decline to accept petitioners' concession. Petitioners had ample opportunity to concede the issue at trial and failed to do so. Their concession on brief is an obvious attempt to avoid the addition to tax due to the overvaluation. Previously, under similar circumstances, *669 we have held that taxpayers should not be able to avoid the addition to tax for overvaluation by conceding the issue on brief. [3] Likewise in the instant case we shall not allow petitioners to avoid the addition to tax for overvaluation by conceding the issue on brief. We held above that the fair market value of the master recording was $ 1,000 although petitioners relied on a value of $ 125,000 in claiming the investment credit. We also held that the transaction lacked economic substance. The fact that petitioners may have relied upon the lessor with respect to a "pass through" of the investment credit under section 48(d) does not avoid the application of section 6659. Soriano v. Commissioner, 90 T.C. at 60. Where a transaction lacks economic substance, the taxpayer takes a zero basis in the asset upon which the taxpayer claims entitlement to investment credit. Zirker v. Commissioner, 87 T.C. 970, 978-979 (1986). Petitioners' claim of entitlement to the investment credit therefore is attributable to a claim of basis *670 in an asset in which they had no basis. Accordingly, because petitioners overvalued the master recording by more than 250 percent, petitioners are liable for the section 6659 addition to tax for valuation overstatement at the rate of 30 percent of the underpayment of tax attributable to the disallowed investment credit. The section 6659 addition does not apply, however, with respect to the underpayments attributable to the disallowed deduction for prepaid rent to American Marketing Company pursuant to the lease or the disallowed deduction for distribution fees paid to Troubador. Soriano v. Commissioner, 90 T.C. at 61-62.
Additions to Tax Under Section 6661
Petitioners bear the burden of proof with respect to the addition to tax under section 6661. Rule 142(a). Section 6661, as amended by section 8002 of the Omnibus Reconciliation Act of 1986, provides that taxpayers whose income tax returns contain substantial understatements of tax may be liable for additions equal to 25 percent of the underpayments attributable to such understatements. See Pallottini v. Commissioner, 90 T.C. 498 (1988). For tax shelter items, the addition can be avoided *671 only if (1) there is substantial authority for the position taken on the return and (2) the taxpayer reasonably believed that such treatment was more likely than not the proper tax treatment. Sec. 6661(b)(2). The taxpayer is considered to reasonably believe that the treatment of an item is more likely than not the proper treatment if the taxpayer analyzes the pertinent facts and authorities and, in reliance upon that analysis, reasonably concludes that there is a greater than 50 percent likelihood that the tax treatment of the item will be upheld. Section 1.6661-5(d)(1), Income Tax Regs.
A substantial understatement is an understatement of tax on a return that exceeds the greater of ten percent of the tax required to be shown on the return or $ 5,000. Section 6661(b)(1). The term "understatement" means the excess of the amount of tax required to be shown on the return for the tax year over the amount of the tax shown on the return. Section 6661(b)(2)(A). Section 6661(b)(3) provides that for the purposes of determining the amount of the addition to tax assessed under section 6661(a), the portion of the substantial understatement on which an addition is imposed under 6659 shall *672 not be taken into account. The portion of the understatement on which the addition under section 6659 has been imposed is taken into account, however, in determining whether there is a substantial understatement of tax. Sec. 1.6661-2(f)(1), Income Tax Regs.
Petitioners argue that they relied on the Ninth Circuit cases cited in Ronnen v. Commissioner, 90 T.C. at 97, cited and discussed above with regard to "Perceived Congressional Intent," as substantial authority. As we stated above, those cases dealt with the question of whether certain motion pictures, tapes, and master sound recordings were tangible personal property eligible for investment credit. Those cases, however, did not involve the issue to be decided in the instant case, namely, whether the transactions lacked economic substance. They therefore do not constitute substantial authority for petitioners' position. Accordingly, petitioners are liable for the addition to tax under section 6661 computed on the portion of the understatement of tax that exceeds the portion of the understatement on which we have imposed the section 6659 addition to tax. Because petitioners did not have substantial authority, *673 we need not address whether they reasonably believed that their tax treatment of the leasing transaction was more likely than not proper. Additions to Tax Under Section 6621(c). Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate established under section 6621(b) if there is a "substantial underpayment" (an underpayment of at least $ 1,000) in any taxable year "attributable to one or more tax-motivated transactions." The increased rate applies to interest accrued after December 1, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(c). Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). Tax-motivated transactions include those involving valuation overstatements and disallowed deductions from activities not entered into for profit. Section 6621(c)(3); section 301.6621-2T, Q-4 and A-4, Proced. and Admin. Regs. (Temporary), T.D. 7998, 1985-1 C.B. 368, 369-370, 49 Fed. Reg. 59394 (December 28, 1984). Congress specifically amended section 6621(c)(3)(A), adding to the list of tax motivated *674 transactions "(v) any sham or fraudulent transaction." [4] "Any sham or fraudulent transaction" includes transactions that are without economic substance. Patin v. Commissioner, supra at 1128-1129. We have found that the master recording transaction involved in the instant case lacks economic substance. The transaction is therefore a tax motivated transaction under the provisions of section 6621(c)(3)(A)(v). See Cherin v. Commissioner, 89 T.C. 986 (1987); Patin v. Commissioner, supra.
Accordingly, the increased interest provided by section 6621(c) applies in the instant case to the underpayment attributable to the investment credit and the disallowed deductions taken with respect to the master recording. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code, as amended and in effect for the relevant year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. In Diego Investors-IV v. Commissioner, T.C. Memo. 1989-630↩, we explained that for a lessee fair market value "in and of itself" was not a good indicator of profitability, although in that case the lease value was derivative of the asset value, which, in turn, was determined on the basis of projected income.
3. Pacheco v. Commissioner, T.C. Memo. 1989-296; Looney v. Commissioner, T.C. Memo. 1988-332↩.
4. Pub. L. 99-514, sec. 1535(a), 100 Stat. 2085, 2750. This amendment is effective for interest accruing after December 31, 1984, the original effective date of section 6621(d), now section 6621(c).↩